In re CHICAGO, R. I. & P. RY. CO.

No. 53209.

District Court, N. D. Illinois, E. D.

June 3, 1943.

840

842

Alexander & Green, of New York City, for Protective Committee for CRI&P General Mortgage 4% Gold Bonds.

Root, Clark, Buckner & Ballantine, of New York City, for Protective Committee for CRI&P First and Refunding 4% Gold Bonds and Secured 4½% Gold Bonds.

Willkie, Owen, Otis, Farr & Gallagher, of New York City, for Protective Committee for BCR&N Consolidated First Mortgage 5% Bonds and New York Trust Co., Trustee.

Wright Gordon, Zachry, Parlin & Cahill, of New York City, for Protective Committee for CO&G Consolidated Mortgage 5% Gold Bonds and C&M First Mortgage 5% Gold Bonds.

White & Case of New York City, for Bankers Trust Co. and R. G. Page, Trustees of General Gold Bond Mortgage of CRI&P.

Auchincloss, Alley & Duncan, of New York City, for Protective Committee for StP&KC Short Line 4½% Gold Bonds.

Beekman, Bogue, Stephens & Black, of New York City, for Protective Committee for RIA&L First Mortgage 4½% Gold Bonds.

Larkin, Rathbone & Perry, of New York City, for Central Hanover Bank & Trust Co., and George S. Hovey, Trustees of First and Refunding Gold Bond Mortgage of CRI&P.

C. M. Clay of Washington, D. C., for Reconstruction Finance Corporation.

Shearman & Sterling, of New York City, for National City Bank of New York, Trustee of 4½% Secured Gold Notes of Sept. 1, 1927.

Sullivan & Cromwell, of New York City, for Marine Midland Trust Co. of New York, Trustee of RIA&L First Mortgage and Trustee of Carrollton Branch Mortgage of CRI& Gulf.

Harry Kirshbaum, of New York City, for Gerald Axelrod.

Cook, Nathan, Lehman & Greenman, of New York City, for Marine Midland Trust Co. of New York, Trustee of StP&KC Short Line First Mortgage 4½% Bonds.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City, for Protective Committee for Holders of Equipment Trust Certificates.

Milbank, Tweed & Hope, of New York City, for Chase Nat. Bank of N. Y., Trustee under Equipment Trust Indentures Series N, O, P & Q, and as Trustee of Indenture securing Convertible 4½% Bonds.

Winston, Strawn & Shaw, of Chicago, Ill., for Bankers Trust Co. and R. G. Page, Trustees of General Gold Bond Mortgage of CRI&P, and for Protective Committee for CRI&P General Mortgage Bonds.

Dickinson, Sprowl, Norville & James, of Chicago, Ill., for Reconstruction Finance Corporation.

Ross & Watts, of Chicago, Ill., for Marine Midland Trust Co. of New York, Trustee of First Mortgage of RIA&L and Trustee of Carrollton Branch First Mortgage of CRI&Gulf.

Isham, Lincoln & Beale, of Chicago, Ill., for Marine Midland Trust Co. of N. Y., Trustee of First Mortgage 4½% Gold Bonds of StP&KCSL.

Tenney, Harding, Sherman & Rogers, of Chicago, Ill., for Protective Committee for Equipment Trust Certificate Holders.

Gann, Secord, Stead & McIntosh, of Chicago, Ill., for Protective Committee for CRI&P 7% and 6% Preferred Stockholders.

Poppenhusen, Johnston, Thompson & Raymond, of Chicago, Ill., for Chase Nat. Bank, Trustee under Equipment Trust Indentures Series N, O, P & Q, and as Trustee of Indenture securing Convertible 4½% Bonds.

Mayer, Meyer, Austrian & Platt, of Chicago, Ill., for Continental Illinois Nat. Bank & Trust Co. of Chicago.

Mudge, Stern, Williams & Tucker, of New York City, for Chase Nat. Bank of New York.

William J. Froelich, of Chicago, Ill., for Continental Illinois Nat. Bank & Trust Co., Trustee.

Louis Cohen and Michael Gesas, both of Chicago, Ill., for Gerald Axelrod.

Defrees, Buckingham, Fiske & O'Brien, of Chicago, Ill., for RIA&L Committee.

H. J. Campbell, Gilruth & Beck, Wilson & McIlvaine, and William C. Boyden, Jr., all of Chicago, Ill., for Group of Institutions, Holders of First & Refunding Bonds and Secured 4½% Bonds.

IGOE, District Judge.

The Chicago, Rock Island and Pacific Railway Company, principal debtor in this proceeding, a railroad corporation organized under the laws of the States of Illinois and Iowa, filed its petition with this court on June 7, 1933, alleging that it was unable to meet its debts as they matured and that it desired to effect a plan of reorganization under Section 77 of Chapter VIII of the Acts of Congress relating to Bankruptcy, 11 U.S.C.A. § 205. On the same day, the court approved the petition as properly filed under said Section 77. Thereafter, certain railroad corporations, subsidiaries of the principal debtor which owned all of the capital stock of each, filed similar petitions in the same proceeding, as follows: St. Paul and Kansas City Short Line Railroad Company, a corporation of the State of Iowa, and Rock Island, Arkansas and Louisiana Railroad Company, a corporation of Arkansas and Louisiana, on August 28, 1933; the Chicago, Rock Island and Gulf Railway Company, Choctaw, Oklahoma and Gulf Railroad Company, Rock Island, Stuttgart and Southern Railway Company, Rock Island Omaha Terminal Railway Company, Rock Island Memphis Terminal Railway Company and Peoria Terminal Company, on October 24, 1933. Each of said petitions stated that the respective petitioners were unable to meet their debts as they matured and desired to effect a plan of reorganization in connection with, or as a part of, the plan of reorganization of the principal debtor; said petitions were approved by the court as properly filed under the Act and in this proceeding. The principal debtor was directed to continue in possession of and to operate the properties of said debtors, excepting the Chicago, Rock Island and Gulf Railway Company and Peoria Terminal Company, which were directed to continue in possession of and to operate their respective properties.

On November 22, 1933, Frank O. Lowden, James E. Gorman and Joseph B. Fleming were appointed Trustees of the Estates of the several debtors, effective December 1, 1933; said appointment was made permanent by order entered December 28, 1933. After the death of James E. Gorman, the surviving Trustees were continued in office; after the death of Frank O. Lowden, Aaron Colnon was appointed substitute Trustee by order of court entered April 19, 1943.

Plans of reorganization were presented to the court as follows: By the Protective Committee representing the Rock Island, Arkansas and Louisiana Railroad Company First Mortgage Bonds, on June 9, 1936; by the principal debtor on July 15, 1936; and by the Protective Committee for the principal debtor's First and Refunding Mortgage Bonds and Secured Series A Bonds, on July 21, 1938. Said plans were likewise filed with the Interstate Commerce Commission.

After extensive hearings and other proceedings before it, the Interstate Commerce Commission issued and approved a plan of reorganization of all said debtor companies by Report and Order dated October 31, 1940, and by Supplemental Report and Order dated July 31, 1941. To eliminate certain errors and inconsistencies in the approved plan, the Commission issued a further supplemental report and order on October 2, 1941, and, upon petition of various parties, a further supplemental report on April 6, 1942, setting forth the basis for allocations of new securities under the approved plan.

On August 23, 1941, the court ordered all parties desiring to object to said plan of reorganization to file said objections and claims for equitable relief on or before September 30, 1941. Said objections and claims were set for hearing on Monday, October 13, 1941; a hearing was held accordingly. Testimony was heard on Monday and Tuesday; extensive arguments by counsel for various parties in interest began on Wednesday morning and were concluded the following Friday afternoon. Thereafter, briefs were filed in support of their objections and claims by counsel representing those interested in the General Mortgage bonds, the Unsecured Convertible 4½% bonds, and the preferred and common stock of the principal debtor; the St. Paul & Kansas City Short Line First Mortgage bonds, the Rock Island, Arkansas & Louisiana First Mortgage bonds, the Little Rock & Hot Springs Western bonds, and the Burlington, Cedar Rapids & Northern Consolidated First Mortgage bonds. Later, briefs in support of the plan were filed by counsel representing those interest-

844

ed in the principal debtor's First & Refunding Mortgage bonds, the Choctaw, Oklahoma & Gulf Railroad Company bonds and Choctaw & Memphis Railroad Company bonds, respectively, and by counsel for Reconstruction Finance Corporation.

On March 29, 1943, the court entered an order permitting any party in interest to file by April 10 a statement setting forth whether, and if so in what respect, the plan of reorganization herein is inconsistent with the decisions given on March 15, 1943, by the Supreme Court·in the Chicago, Milwaukee, St. Paul and Pacific Railroad Company and the Western Pacific Railroad Corporation reorganization cases, and the extent to which this court has power to correct any such inconsistencies by virtue of the provisions of the plan of reorganization herein to the effect that the court may correct any defect, supply any omission or reconcile any such inconsistency in such manner and to such extent as may be necessary or expedient in order to carry out the plan effectively. In response thereto, numerous statements have been filed.

The various lines of railway of the several debtors herein had been operated by the principal debtor, excepting those of the Chicago, Rock Island and Gulf Railway Company and Peoria Terminal Company, each of which was separately operated. This mode of operation has been continued by the Trustees, except that beginning September 1, 1939, the Trustees of the principal debtor leased and operated the properties of The Chicago, Rock Island and Gulf.

The various mortgages of the several debtors herein, the lines of railway covered by the respective liens thereof, and the principal amount of bonds outstanding thereunder, are fully described in the aforesaid reports of the Commission. In addition to mortgage bonds secured by liens on physical properties, the principal debtor has outstanding $39,813,600 principal amount of 4½% Bonds collaterally secured by $45,000,000 principal amount of its First & Refunding bonds; also collaterally secured 6% Notes, $13,718,700 principal amount, representing indebtedness to the Reconstruction Finance Corporation; various bank loans aggregating $3,811,006, collaterally secured; and an issue of un-

secured Convertible 4½% Bonds, $32,228,-000 principal amount. In addition, there are outstanding various equipment trust certificates issued by the Trustees.[1] As of January 1, 1942, the effective date of the plan, the total obligations thus represented amounted to $321,938,577, principal amount, or $429,738,085, principal plus interest accrued and unpaid. These figures include only bonds outstanding in the hands of the public; they do not include bonds constituting liens on the property of the Peoria Terminal Company, whose present corporate identity and separate operation are to be preserved.

The plan contemplates that all of the properties of the several debtors (except Peoria Terminal Company) will be conveyed to and operated by the reorganized company which will issue new securities in lieu of those presently outstanding, with the exception of certain bond issues, relatively small in amount, which, with certain alterations in maturity dates and rates of interest, will remain undisturbed. The principal new securities in the form of debt obligations will be $30,917,060 par value of First Mortgage 4% Bonds, due January 1, 1992, and $80,000,000 par value of General Mortgage 4½% Income Bonds, due January 1, 2017. The liens of these new mortgages will extend, in order of rank, over the entire property of the reorganized company.

The situation thus existing, where there are numerous mortgages, each constituting a lien on only a portion of the property to be acquired by the reorganized company, where the several bond issues thereunder bear different relationships to the value of the property securing the same, where the elements of value pertaining to the several mortgaged properties vary, and where the separate mortgages are to be replaced by system mortgages, presents unusually difficult problems in the creation of a plan of reorganization which shall deal effectively and equitably with the claims of its different classes of creditors.

Formula for Segregation of Revenues and Expenses to Mortgage Divisions.

Subsection c, par. (10), of Section 77 of the Bankruptcy Act contains the following: "(10) The judge may direct the debtor or the trustee or trustees to keep such

---

[1] As of January 1, 1942, the total principal amount was $24,943,916; as of January 1, 1943, the total was reduced to $20,628,000 by reason of serial payments made during 1942.

records and accounts, in addition to the accounts prescribed by the Commission, as will permit of such a segregation and allocation, as the necessities of the case may require, of the earnings and expenses between and to the divisions and parts of the railroad or other property of the debtor which are separately subject to the liens of the various mortgages or deeds of trust, or are separately subject to lease, and may refer to the Commission for its recommendations after hearings thereon if the parties shall so request and/or the Commission determine necessary or desirable, as to the method or formula by which such segregation and allocation shall be made."

The formula with which we are concerned is an outgrowth or extension of an earlier formula prepared in 1934 by the General Auditor of the Trustees and a later modification thereof. The present formula was approved by the court (Order June 17, 1937, referred to as 106-A) and ordered to be applied for each six months' period beginning January 1, 1936 and ending December 31, 1937. The results of its application to the two periods of the year 1936 were filed in the record of this proceeding. In order to make the results of application to the two 1937 periods available in due time for use in the reorganization proceedings before the Commission, an abridgement of the formula for 1937 was authorized by the court, (Order known as 106-B) and results thereunder were likewise obtained and filed in the record. Order 106-A provided that any party desiring to have the formula include any intermortgage division accounting for equipment or property under one mortgage and used in connection with one or more other mortgage divisions might file and serve copies of the proposed provisions relating thereto and move for an appropriate order for a modification of the formula. The order likewise provided that any party might seek modification of the formula in any respect in which it apeared to be incomplete or to operate inequitably; and that nothing in said order should be deemed to require or contemplate that the results of the allocation of earnings and expenses should be the sole factor for consideration in determining the relative values of the different mortgage divisions, or to exclude consideration of other relevant factors, such as contributed traffic, strategic position, prospective earnings, etc.

The First & Refunding Mortgage Committee thereafter proposed additional provisions to the formula for charging mortgaged divisions and leased lines for the use of equipment and facilities which are subject to other mortgages or leases. This proposal was objected to by various parties. The questions involved were eventually decided by the Circuit Court of Appeals; as a result of its decision (7 Cir., 108 F.2d 410), which held that the principle of making a charge for such use was proper and that the measure of the charge should be a fixed and uniform rate of return on the investment, the Commission fixed an annual rental of 4% on equipment and 4% on other facilities.

The formula has been criticized both generally and specifically. The court is well aware that no formula can be devised which is free from assumptions, approximations and forecasts, some of which are unverifiable.

The formula assumes that the various mortgage divisions are independent, separately operated railroads, and attempts to ascertain the revenues obtained and expenses incurred by each. The Commission's accounting classification governing operating expenses affords a reasonable and adequate basis for allocating expenses by divisions. Allocation of revenues presents more difficulty. Local freight and passenger revenues on traffic local to a mortgaged line are allocated directly to that line. Revenue from traffic moving jointly over two or more mortgaged lines is apportioned to each line on the basis of actual mileage as respects passenger traffic, and, with an exception to be hereafter noted, freight revenues are likewise so divided. The court is satisfied in the main that the formula is well devised for its purpose, and shall refer only to one or two details that seem to need mention. The principal criticism is with respect to the allocation of a minimum of 25% each to the originating and terminating lines of revenues from freight traffic handled jointly over two or more mortgaged lines. The criticism is not directed so much to the principle of an extra allowance to the line which originates or terminates the traffic, but rather to the method, i. e., the 25% minimum. Another method is known as the "constructive mileage block". Each method has its origin in the practice in effect between independent carriers in dividing their joint-haul revenues. Once the assumption is made that these mortgage divisions are to be considered as independent carriers, it seems proper to adopt the further assumption

that divisions of revenue of inter-carrier traffic would follow customary practice. The 25% minimum is the general custom in Rock Island territory. The BCR&N Protective Committee claims that the 25% minimum operates to the disadvantage of that line because its hauls are sufficiently long that it receives no benefit from this provision. But it does not prove that a provision, correct in principle, becomes inapplicable because a particular line is unable, by reason of its own facts and circumstances, to take advantage of it. More pertinent to the subject is the statement of counsel for the Committee that the BCR&N lines would have shown a deficit "no matter what kind of a formula we had". (Tr. Oct. 15, 1941, p. 561.)

### Application of Formula.

The Commission made certain adjustments in both 1936 and 1937 earnings by mortgage divisions, as explained in its supplemental report of April 6, 1942. It uses the adjusted formula results in making allocations of the several classes of new securities.

The Commission recognizes that there are various elements of value which are not necessarily reflected in earnings, and that a rigid adherence to the formula basis of distribution would, in certain instances, not recognize values for which new securities should be allotted. Among such elements of value are strategic location, mortgaged properties not used in railway operation, pledge under one mortgage of bonds secured by another mortgage, proceeds of mortgaged property retired, value to the system of a line as a source of company material, etc. So-called "block allotments" of new securities were made to compensate for such values. The Commission's procedure was, after determining the total amount of the securities to be issued by the reorganized company, first to subtract from the total amount of each class of new security, the amount of the block allotments to be made therefrom, and to allocate the residue on the basis of the earnings under the formula. Thus out of a total par value of $19,917,060 of new First Mortgage bonds, $7,793,312 are allotted in block; out of $80,000,000 new General Mortgage Income Bonds, $7,137,-281 are allotted in block; and out of $75,-000,000 par value of new preferred stock, $6,334,031 are allotted in block.

Whatever method—block allotment, or otherwise—be used to compensate for values not measurable by earnings, such method must be applied in advance of the allocation of new securities according to relative earnings; this is so because the latter basis is stated in percentages and the base to which these percentages apply can be determined only after the non-percentage allotments have been determined.

The objections to the formula relate principally to the use made of the results (or adjusted results) obtained thereby, rather than to its intrinsic features. The objections are diverse; the General Mortgage Committee complains because the Commission did not, as respects the General Mortgage bonds, allocate the new fixed interest securities or the new common stock upon the relative earnings of the several mortgage divisions as developed by the formula, notwithstanding the Commission had (as it is said) expressed its intention so to do, but instead applied formula results to the securities remaining after the block allotments. On the other hand, the BCR&N Committee contends that formula earnings furnish no gauge for allocation of new securities to a property which shows formula deficits. The Short Line Trustee, aside from objections to the block allotments, complains of some of the Commission's adjustments of formula earnings, and to the alleged use, as a measure of its participation, of earnings of the "earning" lines exclusive of losses of deficit lines.

General Mortgage Committee: The objection is that the Commission, after announcing that an allocation of new securities should be made, so far as practicable, according to the demonstrated current earning power of the different mortgage divisions, failed to do what it said it was doing. In other words, the Commission did not so allocate the entire amount of the new fixed interest securities, but only the amount remaining after the block allotments.

Whether the Commission's acts are a departure from its announced intentions is not important; the court is concerned only with what was actually done. As the Committee's brief says, in connection with another matter, "The function of the court is to pass upon the legal points in this case and to determine whether or not the plan is 'fair and equitable'." The court finds nothing illegal in the principle of block allotments; whether the principle has been properly applied to specific instances requires inquiry into the question

whether the values for which block allotments are made exist, and whether such allotments are fair compensation therefor.

Burlington, Cedar Rapids & Northern Mortgage Committee: Since the formula showed the BCR&N to be a deficit line, allocation of new securities to its bondholders could not be determined by the formula; hence, the block allotment method was used. The Committee complains of the formula, however, and says that its unsoundness, as applied to the BCR&N, is the reason why that line shows such large deficits, and that these large deficits in turn caused its block allotments to be unfavorable. The complaint against the 25% minimum provision has already been noticed. Again, the formula is criticized because studies were not made, as between the several mortgage lines, of such matters as differences in operating advantage or disabilities, average length of hauls, proportion and relative cost of handling of originated or terminated traffic as compared to overhead traffic, or relative cost of handling of interchange traffic as compared to actual originated or terminated traffic, etc. Differences in operating advantages or disabilities are reflected in operating expenses, and hence in net earnings. But length of haul is not an omitted factor; on the contrary, it is the factor upon which operating line haul revenues are allocated, subject to the 25% minimum. As for the others mentioned, we may observe that to determine the relative cost of handling originated or terminated traffic, as compared to cost of handling overhead traffic, is well nigh impossible, considering that both classes of traffic are intermingled in common trains. The utility of trying to ascertain such relative costs may be doubted, considering the extent to which a division of numerous small items would be involved, and that many such divisions would be sheer estimate. Also, ordinary experience justifies the belief that there is no great disparity between the two classes of costs, since originated or terminated traffic frequently requires no more or different handling at the point of origin or destination than does overhead traffic at its interchange points.

■ It is claimed that the absence from the Commission's reports of analysis or discussion of the formula itself indicates that the Commission did not scrutinize the formula to determine its basic soundness. In our opinion, the formula, which deals with the individual revenue and expense accounts contained in the Commission's standard Accounting Classification, is sufficiently self-explanatory that whether or not it is basically sound can be determined from the terms and text of the formula itself. Some of the factors whose omission is complained of appear to be wholly irrelevant, e. g., that the BCR&N is preponderately an originating and terminating rather than an intermediate line, which tends to increase expenses, that it has operating disabilities due to climate, or that it has a number of branch lines with low traffic density and high operating ratios. These disadvantages are inherent in the property; they largely reflect themselves in net earnings, that is to say, in formula results. The BCR&N bondholders are not entitled to an award of additional securities by reason of these disadvantages.

The propriety of the adjustments which the Commission made in both the 1936 and 1937 formula earnings of the several mortgage divisions will be discussed later in connection with specific objections thereto.

### Block Allotments.

The amount of the block allotments of the several classes of securities and the reasons for which the same were made are set forth in the Commission's supplemental report of April 6, 1942, and schedules attached thereto.

Certain of the block allotments of new First Mortgage bonds were made in respect of particular mortgage lines whose respective earnings have consistently exceeded interest requirements, although in varying degrees, during the years covered by formula studies.

Chicago, Rock Island & Texas First Mortgage bonds (pledged under the principal debtor's General Mortgage) are given $2,102,100 thereof, being equal to the full amount of principal and accrued interest to January 1, 1942.

Chicago, Rock Island & Gulf Main Line bonds (pledged under the principal debtor's First & Refunding Mortgage) are given $2,611,840 principal amount of First Mortgage Bonds and $2,611,840 principal amount of new General Mortgage Income bonds, in respect of the full principal and accrued interest to January 1, 1942.

Choctaw & Memphis First Mortgage bonds are left undisturbed and the principal thereof, $3,524,000 together with $1,409,600 of new First Mortgage bonds to

848

be issued in respect of the accrued and unpaid interest thereon to January 1, 1942, may be considered as a block allotment.

Choctaw, Oklahoma & Gulf bondholders are given a block allotment of $550,000 principal amount of First Mortgage bonds on account of oil royalties received by the Railway Trustees from leases on mortgaged lands and cash representing partial proceeds of sale of abandoned facilities at Ardmore, Oklahoma, which were subject to the CO&G Mortgage; additionally, $150,000 par value of new General Mortgage bonds were similarly allotted on account of the sale of said facilities.

Rock Island Arkansas & Louisiana bondholders are given a block allotment of $750,-000 par value of General Mortgage Income Bonds by reason of the importance of that line as a source of company material and on account of severance value; in further recognition of these elements of value, those bonds receive $650,000 par value of new Preferred Stock.

The Reconstruction Finance Corporation is given a block allotment of $1,119,772 principal amount of First Mortgage Bonds, $1,684,941 principal amount of General Mortgage Income Bonds and $832,781 par value of new Preferred Stock, in recognition of its interest as pledgee of $6,927,000 face amount of Chicago, Rock Island and Gulf Extension First Mortgage Bonds.

Burlington, Cedar Rapids & Northern bonds receive $1,940,500 of new General Mortgage Income bonds, of which $1,100,-000 are given to bonds outstanding in the hands of the public, and $840,500 are given to the First & Refunding bondholders on account of pledges of BCR&N bonds under that mortgage. Additionally, BCR&N bonds receive new Preferred Stock in the amount of $4,851,250, of which $2,750,000 is given to bonds outstanding in the hands of the public and $2,101,250 to the First & Refunding bondholders.

■■ Some of the less controverted issues may be disposed of first. The oil royalties received from leases of CO&G lands are not reflected in the railroad earnings dealt with by the formula. The CO&G bondholders are entitled to the royalties or their equivalent. The block allotment represents the latter. Unlike the ordinary case of railroad abandonments, which are occasioned by reason of operating losses, the terminal properties at Ardmore, Oklahoma, which were sold for continued oper-

ation to another road for $250,000, had a going-concern value. The terminals, which were no longer needed for Rock Island System operation, were an asset of value to the CO&G estate; compensation in lieu of cash, in the form of $100,000 principal amount of First Mortgage Bonds and $150,-000 of General Mortgage Income bonds, is proper.

■ It is an element of value of the Rock Island, Arkansas & Louisiana line that it affords a practical source for company materials, such as ties and other lumber products; the cost of transporting these materials, as compared with tariff rates of a foreign line, is less and the recurrent savings will inure to the benefit of the reorganized company. This item, whether considered directly or as a part of severance value, should be recognized; and the court considers that recognition, in the form of block allotments, is proper. Whether the Commission's allotments of $750,000 principal amount of General Mortgage Income bonds and $650,000 par value of new preferred stock, are a fair measure will be considered in connection with the RIA&L objections generally.

■ The Commission appears to have arrived at the amount of the block allotment of First Mortgage bonds, $1,119,772, to Reconstruction Finance Corporation, on the basis of the segregated earnings of the Gulf Extension Mortgage Division. The adjusted 1936-1937 income of said lines was 4.3% of the system total; the block allotment constitutes approximately 3.03% of the total new fixed income debt, issued or to be assumed, or approximately 3.62% of the total new First Mortgage bonds. See also Chicago R. I. & P. Reorganization, 247 I.C.C. 533, at page 561. But unless the entire fixed interest debt, or the entire amount of First Mortgage bonds, is to be distributed on the basis of proportionate earnings, it is difficult to understand the reason for this apparent preferential treatment. The Commission states that the amount of new securities allocated on account of the Gulf Extension bonds "on further consideration of the entire record, reflects with substantial accuracy the relative value of the Gulf Extension bonds". The record contains evidence that the Extension Mortgage lines have value as a source of fuel oil for the system (I.C.C.Tr.2854) and have a severance value (ibid, 2844). While the Commission's finding on this subject might well have been more specific,

the court believes the amount of the several new securities allotted is supported by evidence of record, and is not disposed to disturb it.

The allotments to the mortgaged lines above mentioned, whose earnings exceeded interest requirements, are sharply controverted. The court has already stated that it finds nothing illegal in the principle of block allotments. Subsection c of Section 77 provides that values shall be determined on the basis which gives due consideration to earning power "and all other relevant facts". The question, therefore, is whether the facts on account of which the Commission made the block allotments are relevant, and, if so, whether the Commission gave them due consideration.

 Choctaw & Memphis Bonds: The undisturbed bonds, together with the new First Mortgage bonds representing all unpaid interest up to January 1, 1942, totaling $4,933,600, may be considered in the category of a block allocation of an equal amount of First Mortgage bonds. Certain objectors claim that it is wholly immaterial, as a basis of distribution of new securities, that interest on any existing mortgage has been earned in the past; that there is no relation between the existing Rock Island debt of about $400,000,000 and the new debt proposed by the Commission; and that to employ one method for distributing securities for lines that do not earn all of the interest requirements on their bonded indebtedness and another method for lines which earn more than the interest requirements on their bonded indebtedness, means that securities are not being distributed on the basis of the values of the lines but upon the basis of their bonded indebtedness. These objections bring forward the question, What is the subject-matter of reorganization? Obviously, it is not the lines of railway which are being reorganized, but the debtor's financial structure. Fair and equitable treatment of creditors must be in accordance with the respective values of their credits. That value is created not only by the value of the property which stands as security, but depends also on the size of the debt as compared to the value of the security. Otherwise, in reorganization, a small bond issue of $10,000 on a specific property would be entitled to no more per bond than if the issue were $10,000,000 instead. It is undoubtedly true, as claimed by the objectors, that the holders and pledgees of Choctaw & Memphis bonds (as well as of CRI & Texas and CRI & Gulf Main Line bonds) receive more favorable treatment than if they had the same proportionate interests in larger liens. They should, under the facts of record. The size of the bond issue, the nature and extent of the mortgaged property and other such factors affecting value, may be supposed to have influenced the buyer in his choice of securities in which to invest his money. The Commission and the Court must take the facts as they exist and not consider hypothetical "proportionate interests in larger liens".

 It is next argued that the formula is erroneous in treating the Choctaw & Memphis line as a "separate mortgage division". Objectors claim that the entire CO&G line constitutes a single mortgage division as between those who are interested in that property and those who are interested in the remainder of the system. Section 77, subsection c, par. (10), provides for the segregation and allocation "of the earnings and expenses between and to the divisions and parts of the railroad or other property of the debtor which are separately subject to the liens of the various mortgages or deeds of trust, or are separately subject to lease". The C&M line is certainly a division or part of the railroad of the debtor, Choctaw, Oklahoma & Gulf. Is it any the less a "part" of the entity which is comprised of the aggregate lines of the several debtors herein? Under the authority of subsection (a), the CO&G and the other subsidiary debtors filed their petitions in the same proceeding instituted by the principal debtor, praying that they be allowed to effect a reorganization in connection with, or as a part of, the reorganization of the principal debtor. The court interprets the above-quoted language of the statute to refer to the unified proceeding and as authorizing a segregation and allocation of earnings and expenses on that basis. Otherwise, a formula would have little or no utility as an index to the distribution of the securities of a reorganized company which is to become owner of all the properties.

Chicago, Rock Island & Texas bonds and CRI& Gulf Main Line bonds: The first of these lines earned more than its bond interest requirements during the formula period, and its bonds received a block allotment of $2,102,100 of First Mortgage bonds, equal to full principal and interest to January 1, 1942. The excess of earn-

850

ings over interest requirements was credited to the CRI& Gulf Main Line bonds which constitute a second lien on the CRI &T properties. This credit, together with the earnings of the line upon which the CRI& Gulf Main Line Mortgage constitutes a first lien, aggregates a sum in excess of the Main Line Mortgage interest requirements, and therefore the Main Line bondholders receive a block allotment in full of principal and accrued interest to January 1, 1942, one-half in First Mortgage bonds and one-half in Income Mortgage bonds. The carry-over principle has been applied by the Commission, and is similarly criticised, where no block allocations of new securities are involved. The excess earnings of the Choctaw & Memphis line, for example, are carried over to the CO&G whose mortgage constitutes a second-mortgage lien thereon, with the result that the CO&G deficit of $165,299, based on adjusted formula results, becomes $83,594 income by virtue of receiving $248,893 excess of C&M income.

This "carry-over" of excess income is declared by objectors to be fallacious in that it makes the value of a line of railway and the total amount of securities distributable to it dependent upon the number, amount and character of the different liens upon it. But again we point out that it is not the lines of railway which are being reorganized, but the correlative rights and liabilities of the creditors and the debtor. Cases may exist where the value of a mortgage derives principally from its second-lien upon certain properties rather than its first-lien upon other property. The second mortgage-interest of the CO&G bondholders in the C&M line, and the second-mortgage interest of the CRI& Gulf Main Line bondholders in the Chicago, Rock Island & Texas Line, are additionally valuable to whatever extent there is an excess of earnings necessary to pay first mortgage interest, or excess value of assets over the amount required to discharge the principal. If that excess exists, it belongs to the second-mortgage bondholders and adds value to their bonds. The court deems it entirely proper that such value should be recognized and given effect to; otherwise, the second mortgage bonds would be deprived of an element of their value.

For the reasons stated, the court concludes that the carry-over principle and its application are proper.

The block allotments to the BCR&N bondholders are made upon a different ground and the propriety thereof will be dealt with in connection with the BCR&N objections generally.

### Distribution of Income Bonds and Preferred Stock.

Under the plan, the new General Mortgage Income bonds are allocated to each issue outstanding in the hands of the public and to secured claims, based on estimated allocation of earnings during what is termed a prospective normal year. After making adjustments, similar to those made for the formula earnings, and after deducting the interest on the several allotments of new First Mortgage Bonds to each mortgage division, the remaining earnings were used to determine the proportionate allotments to each mortgage division of the Income Bonds remaining after the block allotments previously referred to herein.

The new preferred stock is allocated to each present bond issue outstanding in the hands of the public and to secured claims, based on estimated earnings sufficient, after prior charges, to cover preferred stock dividends. Similar adjustments in estimated income, and similar methods of distribution, to those used in connection with the allocations of First Mortgage bonds and of Income Bonds, were used.

Apportionments of the adjusted prospective normal year earnings to the several mortgage divisions are different from the apportionments of the 1936 and 1937 earnings resulting from the application of the formula. For example, the General Mortgage Division has 52.21% of the average total income for the formula years and has 63% of the total adjusted income for the prospective normal year. The method employed was to distribute among the various mortgage divisions the gross earnings of the normal year in proportion of their respective gross earnings during the formula years. Next, the operating expenses to be incurred by the several mortgage divisions in making their gross earnings were estimated, and the net income of each such division arrived at accordingly.

The validity of the results thus obtained is assailed on the ground that there is no basis for assuming that the increased gross revenues of the normal year (estimated at $100,000,000) will result from proportionate increases in the gross earnings of each mortgage division, or that the expenses

of each mortgage division will increase proportionately as its gross rises. Section 77 speaks of prospective earnings as one of the facts relevant to value. The estimate of prospective $100,000,000 of system gross revenues is not criticised; as does any forecast, it involves assumptions and the application of judgment. It was made by a disinterested and competent expert at the request of the management. The estimated net system earnings for the normal year are subject to the same observations. The court believes that such estimates for the system as a whole represent the approximate limit of what is practical in this regard and that an attempt to estimate gross earnings and attendant operating expenses by separate mortgage divisions would involve such an amount of conjecture and unverifiable assumption as to make the results of doubtful value. Operating expenses particularly are subject to a variety of influences, some of which cannot be foreseen even at relatively short range. With respect to the contention that gross revenues and operating expenses do not increase pari passu, it may be observed that while this is generally true, still the factors which present a steady relationship are common to any line and may be expected to operate uniformly upon the basic conditions inherent in each line. The point to which an increase in gross revenues is not accompanied by proportionate increased expenses, or the point beyond which the increase in gross causes an appreciable increase in the expenses, is not necessarily dependent upon whether the line is one of light or heavy traffic density, since there are too many other factors involved, particularly when the several lines are operated as a single system.

The court is of the opinion that the estimates of prospective income are supported by the evidence, that the basis of allocations thereof to the several mortgage divisions is logical and reasonable, and that the method of distributing the new Income Mortgage bonds and new Preferred Stock produces fair and equitable results.

### Objections of Debtor Corporations and of Stockholders.

In its Report of October 31, 1940 (242 I.C.C. 298, at page 438) the Commission stated: "From a consideration of the record, including the elements of value referred to, the past, present, and prospective earnings of the system, we conclude and find that, in these circumstances, the equities of both classes of stockholders have no value."

Its Order provided: "The equity of the holders of the debtor's preferred and common stock having been found to be of no value, such stockholders shall not be entitled to participate in the plan."

In its Supplemental Report of July 31, 1941, the Commission approved a new capitalization of approximately $368,000,000 and stated that this amount "represents a fair estimate of the value of the system's assets for purposes of capitalization". It added, "The secured and unsecured claims against the Rock Island must be satisfied in full before stockholders may participate in the plan of reorganization. Since it is clear on the basis of the above valuation that the creditors cannot be satisfied in full, the equity of the Rock Island stockholders has no value."

The total claims of creditors as of January 1, 1942 aggregated in excess of $430,-000,000.

The debtor complains that the $368,000,000 value of system assets for purposes of capitalization, is arbitrary and is not supported by any statement of reasons therefor. The Supplemental Report of July 31, 1941 states that the value and resulting capitalization of $368,000,000 "is supported by the data on elements of value, earnings, additional investments being made in equipment, and other evidence of record". The Report states that the increase of $17,000,000 over the capitalization of $351,000,000 approved in the original report of October 31, 1940, results from the "further consideration" which the Commission gave to the subject. The fact that no new evidence was submitted in the interim does not indicate that the increase, or indeed the entire amount, is arbitrarily arrived at. The purpose of the Act in allowing petitions to be filed within 60 days and giving the Commission power to modify any plan which it has approved, is obviously to enable the Commission to give further consideration to the facts of record. That it has done so is no cause for complaint.

The courts have many times stated that the fixing of a value is not a matter of formula, but of informed judgment based on the relevant facts. The court believes that the Commission has stated as fully as is reasonably possible the reasons for its conclusions in fixing the value of the sys-

tem's assets for purposes of capitalization; obviously, it cannot state its mental processes, and is not required to do so. Chicago, B. & Q. R. Co. v. Babcock, 204 U.S. 585, 27 S.Ct. 326, 51 L.Ed. 636.

■ The debtor contends that the Commission has no power, under Section 77, to reduce the total capitalization of the debtor company. In Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982, the Supreme Court held that the new capital structure may be revolutionary and need not be patterned after the existing structure. This principle applies in Section 77 proceedings. In re Chicago, M. St. P. & P. R. Co., 7 Cir., 124 F.2d 754, 763; Group of Inst'l. Investors v. Chicago, M. St. P. & P. R. R. Co., 318 U.S. 523, 63 S.Ct. 727, 738, 87 L. Ed. ——. In that case, the total maximum permissible capitalization of the reorganized company was fixed at $548,333,321 as contrasted with a capitalization (exclusive of no par common stock) in excess of $625,-000,000. The amount of capital which has been invested in the property of the debtors and the so-called physical values of the properties are not controlling, although either or both may be useful in fixing the amount which should not be exceeded. But within the limits so indicated, the earning capacity of the property is the proper guide not only for determining the amount of interest-bearing obligations but of preferred and common stock as well, for it would be against the public interest to have outstanding in the hands of the public stock upon which there is no reasonable prospect of any return. A sound reorganization implies a substantial relationship between earning power and capitalization. The provisions of subsection b, par. (4), relative to adequate coverage of fixed charges by the probable earnings available for the payment thereof, are intended as a standard for guidance in determining what proportion of the total capitalization shall consist of fixed interest indebtedness; it does not mean that probability of earnings may be disregarded in providing for contingent interest obligations or stock. In determining the capitalization of the reorganized company, the Commission must follow the standards prescribed for it in administering the provisions of Section 20a of the Interstate Commerce Act, 49 U.S.C.A. § 20a, one of which is that the issuance or assumption of securities of a carrier by railroad must be compatible with the public interest; it would be an anomalous situation if the law were otherwise.

The debtors contend that since railroad property is devoted to a public use and its earnings subject to governmental regulation, a consideration of such earnings as a measure of value in a reorganization case is improper. This court is well aware that in a case where the validity of the governmental regulation is in issue, earning power cannot be made the criterion of value upon which the fairness of the return is to be computed. But this is not such a case. The rates, fares and charges are already fixed. They are one of the conditions under which the business is conducted and they have their effect upon the ultimate financial results as do any of the other factors which affect the revenues or expenses, such as taxes, compliance with safety appliance laws and other police regulations, climate, the nature of the territory served, etc. The resulting income is the product of all these composite forces; the Commission and the court must take that product as an ultimate fact. Furthermore, the debtors' attempted distinction between property devoted to the public use and ordinary commercial or industrial property is unsound; the earnings of the latter class are subject to and affected by governmental regulation, as witness the Wages-Hours Act, 29 U.S.C.A. § 201 et seq. corporate excise taxes, workmen's compensation statutes, and the like.

■ If the debtor has in mind a value beyond that produced by earning power, the answer is that such value is not appropriate in a proceeding such as this. As the Supreme Court said in the Milwaukee case: "The basic question in a valuation for reorganization purposes is how much the enterprise in all probability can earn. Earning power was the primary test in former railroad reorganizations under equity receivership proceedings. * * * The reasons why it is the appropriate test are apparent."

■■ The debtors likewise complain of the Commission's estimate of the earning power of the property. From the facts of record, we cannot agree that the earnings of the pre-depression years are a fair measure of prospective earning power. The Commission estimated that $96,210,000 of total operating revenues would be reached by the year 1941 and that $11,000,-

000 thereof would be available for interest *and* dividends. 242 I.C.C. 435, 437. However, elsewhere the Commission states that the $11,000,000 earnings of a prospective normal year were used to measure the total amount of fixed and contingent interest obligations (ibid. 438). But whether the estimated $11,000,000 is intended to represent earnings available for interest *and* dividends, as the debtor contends, and not merely the interest requirements, and whether an estimate of $11,000,000 net income from a gross of $96,000,000 is unduly low, the court is of opinion that the errors, if such they be, are not sufficiently large that their correction would benefit the stockholders. It is true that in 1941 the actual gross revenues were $96,962,498 and that there remained therefrom a balance of $18,149,929 available for interest and dividends. But there was no income tax liability for 1941 by reason of allowable deductions for carry-over losses. These losses would not be available to the reorganized company; had the plan been in effect during 1941, the $18,149,929, would be sharply reduced and this would be the case even if the provisions of the 1942 Revenue Law relating to income tax liability of a reorganized railroad had then been in effect.

 Also, operating conditions were unusual in that the increased volume of traffic, mostly freight, could be handled with greater concentration, thereby permitting locomotives to haul more nearly their full tonnage capacity. This is shown by the fact that despite a slight decrease under 1940 in revenues per ton and per mile, revenues per freight train mile increased 50.6 cents. Average haul per ton of revenue freight increased as well as the number of tons per loaded car mile. These favorable conditions resulted largely from the National Defense program at home and war conditions abroad; in normal times it may well be doubted whether operations can be carried on in such fashion that $96,000,000 of earnings will produce as much as $18,352,967 even after giving consideration to the abilities of the present management and economies from capital expenditures during trusteeship. Even with a fair degree of optimism, the fact remains that there would be still unsatisfied claims of creditors of over $89,000,000 which must be taken care of before the stockholders can participate. The $32,-228,000 principal amount of the unsecured

Convertible Bonds will receive new common stock allotted at the rate of 4⅓ shares for each $1,000 thereof, and will receive nothing on account of $12,568,920 accrued and unpaid interest; general claims receive 13/30 of 1 share of common stock for each $100 principal amount of claim. Indeed, except for the General Mortgage bonds, there is no class of mortgage security which will receive 100% of the total amount due thereon in aggregate par value of new securities. It is plain that full satisfaction of the creditors' claims is impossible; and short of that satisfaction, there can be nothing given to the stockholders.

The debtors point out that over $50,000,-000 has been spent in additions and betterments to the property during the trusteeship; they complain that this money could have been used to reduce the claims of creditors by paying interest on the secured indebtedness and that the junior interests, including stockholders, should be given credit for the money thus spent in improving the property. The court is unable to agree. The debtors' claim takes no account of property retirements made during the same period, which were unusually large and exceeded the amount spent for improvements. The debtors' claim is necessarily without merit unless it is based upon the proposition that said expenditures resulted in a net increase in the value of the mortgaged properties. This premise is untrue because of the property retirements.

 Finally, the debtors allege that the Commission has no power to fix the effective date of the plan at January 1, 1942, but that it must be made effective as of the date on which the petition was approved, June 7, 1933. The debtors' concern arises from the accrual of interest on the secured claims during the interval, amounting to approximately $14,000,000 a year. That point has been determined adversely to the debtor by the Supreme Court in Group of Inst'l. Investors v. Chicago, M. St. P. & P. R. Co., supra. The debtors make reference, however, to subsection (*l*) of Section 77, which provides that in the proceedings thereunder: "The rights and liabilities of creditors, and of all persons with respect to the debtor and its property, shall be the same as if a voluntary petition for adjudication had been filed and a decree of adjudication had been entered on the day when the debtor's petition was filed."

This does not mean that the money measure of the rights and liabilities must be taken as of the date on which the petition is filed and approved. The right to receive interest is different from the amount of money which may be realized therefrom. The language simply means that the creditors' rights shall be neither increased nor diminished, but shall continue to operate according to their terms.

The debtors object to certain features of the plan which, it is alleged, operate adversely upon the creditors; we do not notice these since the creditors are entitled to speak for themselves. Also, objection is made that certain creditors—Reconstruction Finance Corporation and the Banks—are too well treated, in that their claims are provided for on the basis of their collateral. The court agrees with what was said on this point in the case of Chicago & North Western Railway Company, D.C., 35 F.Supp. 230, 242.

The debtors object that the plan does not take into account the impact of federal excess profits taxes and income taxes on the proposed capital structure. Under revenue laws in effect at the time the plan was certified, the reorganized company, if a new corporation, would be entitled to a relatively low invested capital, and this might result in large excess profits taxes. The plan was also assailed on the ground that the new capitalization consisted of such a small proportion of funded debt that interest deductions for income tax purposes will be correspondingly low and permit a disproportionate share of income to be taxed. The first objection has been removed by the provisions of the 1942 Revenue Act. The court does not believe that the plan should be disturbed by reason of the second objection; to increase the amount of interest-bearing obligations might endanger the long-range financial stability of the reorganized company. In any event, the tax burden will fall upon the future owners of the property, and not upon the present debtors or their stockholders.

### General Mortgage Bonds.

This bond issue totals $99,981,000 principal amount, of which $38,400,000 are pledged as security under the First & Refunding Mortgage. They are secured by a direct first lien on approximately 3,060 miles of railroad and a considerable amount of rolling stock; they constitute a collateral lien on the line of the Chicago, Rock Island and Texas Railway through pledge of the latter company's First Mortgage bonds, $1,365,000 principal amount. The mortgage is also secured by a lien on various trackage-right contracts totaling 187.25 miles and by the leasehold interest of the principal debtor in Peoria & Bureau Valley Railroad.

The principal objections of the General Mortgage interests relate to the Commission's methods of distribution of the new securities. The contentions relating to the block allotments and the correct determination of what parts of the System comprise "mortgage divisions" for the purposes of allocating new securities have already been discussed and disposed of. One phase of the "mortgage division" argument has reference to the line subject to the BCR&N Mortgage, on which the First & Refunding Mortgage is a second lien. It is contended that the BCR&N lines are an' integral part of the "First & Refunding Division," as a result of which the BCR&N deficits should be subtracted from the earnings of those lines upon which the First & Refunding Mortgage is a first mortgage and the remainder used as the basis of allocation of new securities to the First and Refunding bondholders. The court finds no merit in this contention; the carry-over principle applied to the excess earnings of Choctaw & Memphis, Chicago, Rock Island & Texas and Chicago, Rock Island & Gulf Main Line bonds, is not germane here. Those lines had earnings in excess of first mortgage interest requirements and the excess earnings were applied to the interest requirements of the second mortgages. But it does not follow that where a line does not have earnings sufficient to meet its first mortgage interest requirements in whole or in part, the second mortgage bondholders are to be charged accordingly. A mortgage is a contract; if the mortgagor company is unable to fulfill its obligations, the mortgagee may be disappointed in the result; but his right to receive earnings, if any, has no correlative obligation to make up deficits. The First & Refunding bondholders do not—and under the facts here, should not—receive new securities by reason of their second mortgage on the BCR&N lines; but that second mortgage does not and should not operate to diminish their rights with respect to other lines which stand as. a separate and independent security.

■ But it is claimed that by treating the BCR&N as a separate mortgage division, the Commission has thereby used earnings of the General Mortgage lines to meet the expense of operations over the BCR&N lines. To understand this objection, it is necessary to state more particularly what the Commission did, as shown by Schedule A to its Supplemental Report of April 6, 1942. The average adjusted income of the system for the formula years 1936 and 1937 was $4,101,087; that sum is the composite result of the earnings and the deficits, as the case may be, of the several divisions. The total average income of the lines which had earnings amounted to $5,483,-596; the total average income of the lines which participate in the initial distribution of new first mortgage bonds is $4,337,163 which includes $1,127,341 of First & Refunding Mortgage Division earnings. Of said total, the $2,261,416 earnings of the General Mortgage Division amount to 52.21%. If the BCR&N average deficit of $1,110,127 were subtracted from the first & Refunding Mortgage Division earnings, the total would be correspondingly reduced to $3,221,035, of which the General Mortgage Division earnings would be 70%. Thus, the claim is made that the earnings of the General Mortgage Division were, in effect, unlawfully diverted permanently to pay for the operation of the BCR&N lines. The court has already rejected the hypothesis upon which this contention rests. The Commission did not charge the deficit of the BCR&N, or the deficit of any other line, against any mortgage division; the lines or mortgage divisions which participate in the initial distribution of new first mortgage bonds do so in the proportion that the earnings of each bear to the total earnings of such lines. The court finds nothing improper in this method.

■ It is next urged that the plan discriminates against the General Mortgage bonds in consequence of the treatment of those bonds as compared with the First & Refunding bonds and with the claims of the bank creditors.

The General Mortgage bonds outstanding in the hands of the public, together with accrued and unpaid interest thereon to January 1, 1942, total $81,286,920; they are allotted $81,286,920 principal amount of new securities, of which $20,714,220 consists of common stock (taken at $100 per share). The Commission holds that these bonds receive "full satisfaction".

The Banks receive securities whose par value (including common stock at $100 per share) aggregates approximately 2½ times the principal and accrued interest on their notes. The Commission arrived at this result by allocating the new securities to the Banks on the basis of their collateral. The General Mortgage Committee asserts that it is an absurd result that it should take 2½ times as large an amount of the same new securities to satisfy the claims of the Banks as is required to satisfy the General Mortgage Bonds; that, in consequence, either the General Mortgage Bonds have not received full satisfaction or the Banks receive more than full satisfaction. The court is of the opinion that this contention fails to give effect to the legal rights of a pledgee of securities to secure a note of the same obligor. The securities held by the Banks are obligations of the principal debtor, either as mortgagor or guarantor. The subject is fully discussed in the Chicago & North Western Reorganization case, 35 F.Supp. 230, 242, 243; affirmed 7 Cir., 126 F.2d 351. An attempt is made to distinguish the Chicago & North Western case, based upon the following language in the District Court's opinion:

"In this case it is not clear whether the First and Refunding Mortgage Bonds are fully secured. It is clear that there are some unmortgaged assets in which unsecured creditors are entitled to participate pari passu with any unsecured portion of the claims of mortgage bondholders."

The distinction is said to arise "because the Commission has clearly found, in Schedule F of the Supplemental Report of April 6, 1942, that the General Mortgage is 'fully secured'" (G. M. Committee brief, p. 74). But the expression in Schedule F, is "full satisfaction". The phrase "fully secured" refers to the value of the property embraced by the mortgage; whether or not new securities allotted constitute full satisfaction of the mortgage debt is a different matter. In the excerpt above quoted, the District Court was comparing the relative treatment of said First and Refunding Mortgage Bonds (which are analogous to the General Mortgage Bonds here) and the unsecured creditors. The point under discussion was whether, if the said bonds were not fully secured by the mortgaged property, the unsecured portion of their claim could receive common stock on a more favorable basis than the unsecured creditors; the claim of Reconstruction

Finance Corporation (analogous to the Banks here) was not involved. Here, as between the General Mortgage Bonds and the Banks, the question is whether each class is fully secured and the right of either class to resort to unmortgaged assets, is not involved. As above stated, the analogous situation in the North Western case was between the First and Refunding Bonds and Reconstruction Finance Corporation, and the issue between them was disposed of on the ground that the Corporation had the right to realize the liquidation value of its collateral.

In disposing of the claim of discrimination by reason of the distribution of $33,584,420 of new common stock to the holders of First and Refunding bonds because of their second lien on the General Mortgage properties, the court is required to determine whether the senior issue has received "full compensatory treatment". This question must not be confused with that of relative fairness to the several groups of first-lien bondholders inter se; it generally is impossible to satisfy each first-lien group in whole, but as long as each retains the same values in relation to the others the requirements of fairness and equity are satisfied. Or, as stated by the Supreme Court in the Milwaukee case: "It is sufficient that each security holder in the order of his priority receives from that which is available for the satisfaction of his claim the equitable equivalent of the rights surrendered." But before a junior interest can participate in a plan, the interest which is senior thereto must have received "full compensatory treatment"; otherwise it has not received the equitable equivalent to the interest in the old company that it surrenders. The Commission's supplemental report of April 6, 1942 contains the statement (Schedule F, footnote, line 3) that the $81,286,920 principal amount of new securities allotted to the General Mortgage represent the "amount required for full satisfaction of its claim", i. e., $81,286,920, principal and interest, or $1,320 per $1,000 bond. Assuming this statement to be a specific finding of full satisfaction, or full compensatory treatment, it remains for the court to determine whether the Commission was correct on this point. Each bond receives in new securities $83.51 of First Mortgage bonds, $454.14 Income Mortgage bonds, $445.98 of preferred stock, and $336.37 common stock, total $1,320. The plan does not reveal that the General Mortgage bondholders receive anything, other than these new securities, by way of compensatory treatment in whole or in part. The court is of the opinion that $1,320 par value of new securities, of the amounts and classes as stated, does not represent full compensation for $1,320 of first-lien claim. To hold otherwise, the court would have to find that each share of new common stock is equivalent in value to $100 of the lien debt. The relevant facts of record, and the findings of the Commission bearing upon the probable earning power of the reorganized company and upon the investment features of the new securities, plainly indicate the contrary. The reorganized company will need an annual net income available for interest and other mortgage requirements, federal taxes at present rates, and full dividends on its preferred stock, of $14,980,000 before having any sum available for dividends on its common stock. While present earnings of the property are at a rate considerably larger than $14,980,000 per year, yet as the Supreme Court said in the Milwaukee case, the figures of war earnings cannot serve as a reliable criterion for the indefinite future. While the Commission's estimate of earnings during a prospective normal year of approximately $11,000,000 may prove to have been too low, yet it can be stated with confidence that future earnings are unlikely to maintain consistently the level necessary to give a share of common stock a value equal to the present value of each $100 of General Mortgage claim.

Schedule F shows that the initial distribution of common stock to the General Mortgage bonds, based on earnings, is $67,216,860. Of this amount, $33,584,420 is distributed to the First & Refunding bondholders because of their second lien on the General Mortgage properties. The question of what, if any, portion of said 335,844.2 shares should be allotted to the General Mortgage bonds in order to afford full compensatory treatment thereto, must be answered in the first instance by the Commission.

### St. Paul & Kansas City Short Line Bonds.

The objections on behalf of the holders of these bonds relate to the fairness of the allocation of securities. Those not already disposed of are as follows:

It is claimed that the Short Line has been charged with a part of the losses of

the deficit lines. The Short Line Mortgage Trustee's brief states:

"As shown by the Commission's computations, the total normalized average annual losses of the deficit lines under the formulae, aggregate $1,217,210 (Sch. A, p. 1, 1. 28). The Short Line bears 12.20% of this deficit (Sch. A, p. 1, 1. 31). If the losses of the deficit lines had not been excluded from the computations for the distribution of new First Mortgage bonds, the total earnings would have been $3,113,952 instead of $4,331,162 (Sch. A, p. 1, 1. 30, less the losses of the deficit lines) and the Short Line's percentage of new First Mortgage bonds, after block allocations, would have been about 17% instead of 12.20%." (p. 36)

The error here consists in assuming that the $4,331,162 represents total earnings exclusive of the losses of the deficit lines, whereas that sum represents the earnings of only certain of the "earnings" lines, namely.

| | |
|---|---|
| General Mortgage | $2,261,416 |
| First & Refunding | 1,127,344 |
| Short Line | 528,162 |
| CO&G | 83,594 |
| RIA&L | 330,616 |
| | $4,331,162 |

The total earnings of *all* of the lines which had earnings during the formula years amount to $5,483,596 [2] and it is from this sum that the aggregate deficits should be subtracted if they are to be excluded from the computations for the distribution of new First Mortgage Bonds. As a result of said error, the alleged total earnings figure of $3,113,952 has no real existence nor has the 17% based thereon. The percentage of Short Line earnings to said total earnings of the divisions which had earnings is approximately 9.63%, whereas the percentage used by the Commission is 12.20%.

Objection is made that the Plan fails to reflect the distribution of several million dollars of cash to various creditors during the course of the proceedings. Substantially all of these payments represented interest. The principal ones were two semi-annual installments of interest on

General Mortgage Bonds for the year 1933, totaling $3,971,259; Reconstruction Finance Corporation obtained various sums representing amounts received through its collateral securities; and certain creditor banks impounded and kept money held by them as general deposits of the principal debtor.

The first General Mortgage interest installment was paid pursuant to court order entered October 22, 1933 upon the petition of the First and Refunding Mortgage Trustee; the second installment was paid pursuant to court order entered June 26, 1934 upon the petition of the Railway Trustees which alleged that it was greatly to the interest of the trust estate and of all creditors and stockholders having claims or interest therein that there be no default in the payment of the interest on said bonds. The Short Line Trustee contends that the amounts thus paid should be adjusted by deducting an equal face amount of new First Mortgage bonds from the share of the General Mortgage and then distributing such bonds among all of the divisions on the basis of their relative earnings. It is argued (Brief, p. 51) that neither any of the interests nor the court intended to treat the $4,000,000 as a gift, as evidenced by the following provision in the order of June 26, 1934:

"The Court reserves the right, upon application by any of the parties to these proceedings at any time during the pendency thereof, to determine upon an equitable adjustment as between all those interested in this proceeding with respect to any use which may have been made of any tolls, earnings, income, rents, issues and profits of any portion of the trust estate."

Undoubtedly all parties, and the Railway Trustees as well, concurred in the belief that to avoid a default under the General Mortgage, with resulting acceleration of maturity, would be to the advantage of all concerned. In the light of circumstances then existing, that belief was justified; the amount of bonds, $99,981,000, was large, the interest rate of 4% was relatively low, and the bonds were not due to mature until January 1, 1988. Reorganization would have been simplified if circumstances had permitted these bonds

---

[2] See Short Line Mortgage Trustee's brief, page 11, where the amount is stated to be $5,318,297; this figure does not take proper account of the fact that the $165,299 deficit of the CO&G was overcome by the carry-over of C&M excess earnings over interest requirements.

858

to remain undisturbed. The parties considered that the wise course was to pay the interest and avoid the consequence of a default. They received the expected advantages; the fact that these advantages later disappeared by force of subsequent events is no reason why the interest payments should now be reclaimed. Whether and to what extent the earnings, income and profits of the several mortgage divisions furnished the funds used for the interest payments, are not shown by the record. Any party in interest desiring the court to determine the equitable adjustment referred to in the order of June 26, 1934 should have made an application in that behalf and have submitted the facts upon which such determination might be made.

 The formula permits, but does not require, contributed traffic to be considered in determining the relative values of the different mortgage divisions. The Commission, in the exercise of its judgment, re-allotted two per cent of the initial distribution of each class of new securities, except common stock, in recognition of this factor. The mortgage divisions which are debtors in respect of contributed traffic are those of the General Mortgage and the Short Line; from the initial distribution of the latter, there were taken $128,730 of First Mortgage Bonds, $773,656 of General Mortgage Income Bonds and $729,095 of preferred stock. No inference can be drawn from these amounts in and of themselves. The Short Line Trustee objects to the adjustment both in principle and in its application. The location of the Short Line Mortgage lines, both geographically and in relation to the other system lines, is such that their traffic contribution is small. As previously stated with respect to the 25 per cent minimum division, a provision which is otherwise correct in principle does not become inapplicable because a particular line is unable, by reason of its own facts and circumstances, to benefit from it. The principle involved must be examined on its inherent merits; if meritorious, the fact that it necessarily reduces the allocation to a so-called bridge line, is not material.

 The court agrees with the Commission's conclusion that the factor of contributed traffic is one to be considered in connection with the determination of the relative values of the various mortgage lines. Traffic (or, to use a synonymous term, transportation) is the commodity which a railroad sells. Reaching the sources of traffic and securing it are factors of strategic value of a line. It is asserted that the contributed traffic adjustment in the plan is invalid because the values thereof were considered without regard to whether the contributing line had control of the traffic. The Commission based its computation on studies prepared by the Accounting Department of the Trustees; those studies represented the actual situation. It would be improper, to say nothing of fruitless, to attempt to go behind the facts and to discover the motives or reasons why the traffic moved the way it did, or to forecast whether and to what extent future changes might take place. Complaint is also made that traffic received in interchange was considered in the category of originated traffic. Competition between carriers at important interchange points in securing traffic from connections is not different from competition in securing traffic from shippers at points of origin; the court believes that interchange traffic was properly included.

It is further objected that recognition was based upon gross revenues instead of net revenues because the benefit received by one mortgage division from traffic contributed by another depends on the resulting profit, if any. It seems sufficient answer to say that if the receiving line is unable to handle its traffic at a profit, that result must be due to operating conditions inherent in that line itself and is not the fault of the line which furnishes the traffic. There is no apparent reason why contributed traffic cannot be handled on relatively the same basis of expense as other traffic; certainly the contributed traffic, by increasing the total volume either increases profits or keeps deficits from being as large as they would otherwise be.

 It is next insisted that adequate recognition has not been given for the strategic position of the Short Line. This has reference principally to the Hickory Creek-Birmingham Division which was built and put in operation about 1931; the new line gives a shorter and better route in lieu of the one previously used via Cameron Junction and trackage rights over a foreign line. Estimates made by the management show that the savings effected by operations over the new line are somewhat in excess of $500,000 per year. The Short Line Trustee does not claim that

these savings or the revenue on traffic which would be lost by operation over alternate Rock Island routes should be added to the formula earnings of the Short Line. The contention is that "these are elements which should be considered with the Short Line formulae earnings". The brief is silent, however, as to the manner of consideration or how these features should be translated into results. The phrase "strategic value" is a general one and can be applied at large to every bridge, tunnel, cut-off, etc., in the system. About all it means with respect to the Hickory Creek-Birmingham Division is that the line is well located and designed for the purpose intended. The fact that it replaced a former route which was less direct and with less favorable grades, is of no significance. If the line in question had been built fifty or more years ago as part of the original construction of the system in that territory instead of in 1930, the "savings" argument would necessarily disappear. The fact that the line came into existence later instead of earlier, furnishes no reason for an allotment of securities. If the old route had been twice as long and twice as crooked as it was, the "savings" would have been correspondingly increased; yet the Short Line would be exactly what it is today. \Strategic position must have reference to presently existing circumstances, and, so considered, the Short Line is simply a 73-mile segment of railroad, not essentially unlike any other 73-mile segment of primary main line in the system. The same observations may be made of the Allerton-Manly Junction Division, which, with the Hickory Creek-Birmingham Division, constitutes a part of the through Rock Island Route between the Twin Cities and Kansas City. Whatever strategic position this route may have, it inheres in the route as an entirety. Indeed, if strategic location is given the meaning or significance attributed to that term by the Short Line, it is difficult to perceive why similar claims may not be made for every one of the other main lines which make up the system; such claims, if allowed, would leave their relative values undisturbed.

■■ Finally, it is claimed that the measure of the adjustment, 2 per cent, is arbitrary and should be disapproved on that account. Admittedly, this element of value is difficult to measure by any formulistic method; but the court is impressed with the fact that such value is substantial in character and that the 2 per cent is hardly more than nominal. The Short Line Trustee's brief is barren of any alternative percentage or method of computation.

#### Rock Island, Arkansas & Louisiana R. R. Co.

■■■ The Protective Committee representing the bonds of this company proposed a plan for separate reorganization which provided for the conveyance of the company's properties to Louisiana & Arkansas Railway Company. In its Supplemental Report of July 31, 1941, the Commission stated that the proposed acquisition by Louisiana & Arkansas R. Co. would not be in the public interest. Since that company cannot lawfully acquire the properties without the approval of the Interstate Commerce Commission under Section 5 of the Interstate Commerce Act and since it is a statutory condition to such approval that the Commission shall find that the acquisition is consistent with the public interest, the proposed separate organization cannot be had. Also, it is a fact, of which the court may take judicial notice, that Louisiana & Arkansas R. Co. has dismissed its application to the Interstate Commerce Commission for authority to acquire the Rock Island, Arkansas & Louisiana properties; the Commission entered its order of dismissal on July 25, 1942.

Complaint is made that the plan does not provide for adequate treatment of the RIAL bondholders in the allotment of new securities. Earning power is conceded to be an important basis for determination of values.

■■ Criticism arises from the Commission's alleged failure to give effect to cost of reproduction new less depreciation and the original cost of the property.

Section 77, subsection e, provides: "In determining such value only such effect shall be given to the present cost of reproduction new and less depreciation and original cost of the property, and the actual investment therein, as may be required under the law of the land, in light of its earning power and all other relevant facts."

This provision is far from requiring present cost of reproduction new less depreciation, or original cost of the property, to be given the effect contended for in the

Committee's brief. As heretofore stated, physical values may be useful in fixing the amount of securities which should not be exceeded. If requisite earning power exists, the cost of reproduction or original cost should be given effect to. The phrase of the statute "in the light of its earning power" is a qualification of the entire process of determining value. The RIAL Mortgage Division is not entitled to treatment different from other mortgage divisions in this respect. The report which the Commission filed in the proceedings before it, show that the cost of reproduction of the system, less depreciation, plus the value of lands and rights, and exclusive of working capital, as of December 31, 1935, was $427,630,485. The Supplemental Report of July 31, 1941 states that the system value and resulting capitalization of $368,000,000 for the purposes of the plan "is supported by the data on elements of value, earnings, additional investments being made in equipment, and other evidence of record." The Committee does not make it appear that the Commission ignored such consideration of cost of reproduction, original cost and actual investment as is required by the law of the land.

The Committee is dissatisfied with the amounts of the block allotments of income bonds and preferred stock representing the importance of the line as a source of company material and the practicable possibilities of severance of the line from the Rock Island System. The Committee claims that the severance value was fixed by the Commission at $2,175,162 annually. This is incorrect. What the Commission said was that based upon traffic for the year 1936, the system's loss of revenue, if the RIA&L were severed therefrom, would be $2,175,162. 242 I. C. C. at page 356.

 The Company material obtained from RIA&L territory consists principally of forest products. Based on experience elsewhere in the country, it can be reasonably foreseen that this source of supply will become exhausted at some future time; no award of securities should be based upon the assumption that these products will be supplied in perpetuity. The materials could be obtained by the System from other sources; the value of the RIA&L line in this respect is in the saving of transportation costs as compared with tariff rates of foreign lines. The court is unable to conclude from the evidence that the block allotments given in recognition of this element of value are inadequate.

 The discovery of oil along the RIA&L right of way in Louisiana presents as yet merely a possibility so far as the RIA&L is concerned, either from the standpoint of producing-wells on its own property, or as a traffic furnishing commodity. The ultimate benefits are too speculative in fact and amount to warrant any change in the plan of reorganization.

 In this connection, the claims of the holders of the presently outstanding $1,140,000 of Little Rock & Hot Springs Western R. Co. First Mortgage Bonds, dated July 1, 1899, may be noticed. These bonds constitute a lien upon a line of railroad approximately 53 miles in length. In 1911, the RIA&L purchased the segment, approximately 22 miles in length, between Benton and Hot Springs Junction (Little Rock), Arkansas, for which it gave its notes for $453,600 face amount; the remaining 31 miles are now owned by Missouri Pacific Railroad Co. The entire mortgage debt is indivisibly secured by a lien upon the entire 53 miles. The plan provides that out of the securities distributable to the RIA&L, there should be redistributed to the Little Rock & Hot Springs Western Bonds $48,172 of new First Mortgage Bonds, $215,328 of General Mortgage Income Bonds, $174,241 of Preferred Stock and 723.22 shares of no par common stock. The lien of the mortgage upon said 22 miles is to be released. These provisions of the plan are alleged to be unfair and inequitable in several respects. First, it is claimed that in making its allocation of securities, the Commission ignored the earnings shown by applying the formula to the 22 miles of line in question. The 22-mile segment, although covered by a separate mortgage, was not treated as a separate mortgage division under the formula. An exhibit filed on the formula basis was submitted to the Commission; this showed earnings (after certain adjustments) of $97,562 and $101,711 for the years 1936 and 1937, respectively. The Commission's report states that these adjusted earnings do not take into account, as they should, rental charges against the Little Rock & Hot Springs Western line for the use of facilities of other lines. The Commission's redistribution represents 5.14 per cent of the securities (except the common stock) initially

distributable to the RIA&L and is based on a mileage pro rate. It is contended that the line in question constitutes a separate mortgage division and that as such, its separate earnings should be given effect to. The court is of the opinion that said line does not constitute a separate mortgage division. An anomalous situation is presented. If there is a mortgage division, it must necessarily embrace the entire 53 miles of line covered by the mortgage; yet, only 22 miles thereof is owned by the RIA&L. The mortgage debt and the security are indivisible, as the objectors recognize (Brief, p. 3). The value of the bonds depends in part upon the value of property not involved in these proceedings. Under such circumstances, the court is of opinion that the Commission was correct in treating the 22 miles of line as part of the RIA&L Mortgage Division and in allocating a portion of the securities distributable to the RIA&L. The Commission used pro rata mileage as a factor of allocation because this reflected the status of this segment as essentially a bridge line, i.e., a line which originates or terminates little or no traffic. The Circuit Court of Appeals, In re Chicago & N. W. Ry. Co., 7 Cir., 126 F.2d 351, 370, states that accountants have shown different names and adopted different methods of ascertaining value of bridge lines. The value of this segment involves an appraisal of many factors calling for the exercise of an informed judgment. Whether an earnings study should have been made was for the Commission to decide in the light of the requirements of the particular instance. As stated, it rejected the study presented on behalf of the bondholders. It may be doubted whether a segregation earnings study was even necessary or desirable; the line constitutes only a small, integral part of the RIA&L Mortgage Division. Undoubtedly, if any mortgage division were subdivided and separate earnings studies made for each part (assuming that could be done with reasonable certainty) the results would reveal inequality of earning power as between those parts. There must be a limit to which the process is carried.

Under the circumstances presented, the court is of opinion that distribution of securities, initially allocable to the RIA&L Mortgage Division as a unit, on a mileage pro rata basis is fair and equitable to the Little Rock & Hot Springs Western bondholders.

The plan provides that if deemed desirable and so ordered by the court, it may be executed by a sale of all or any part of the properties of the debtors. This provision is based upon subsection b(5), which authorizes "the sale of all or any part of the property of the debtor either subject to or free from any lien at not less than a fair upset price." The plan provides that upon any such sale, the property may be purchased for the benefit of the reorganized company by the reorganization managers. The court is mindful of the fact that both the principal debtor's plan and the First & Refunding Committee's plan contained provisions for abandonment of operations over the Little Rock & Hot Springs Western line and making alternate arrangements for handling traffic between Benton and Hot Springs Junction. It thus appears that in the event such sale were made and the line were purchased by outside interests, the reorganized company would not be left without means of securing substitute facilities. The contention that the plan should be modified by providing that such sale be authorized only for the entire mortgaged property as a unit must be overruled; this court has no jurisdiction to order the sale of property not owned by any debtor herein, or to attach conditions to the sale of any debtor's property which would have the effect of bringing about the desired result. This objection is therefore overruled.

### Burlington, Cedar Rapids & Northern Consolidated First Mortgage Bonds.

The principal criticisms directed on behalf of the bondholders against the formula and its application to the lines covered by the BCR&N Mortgage have been heretofore noticed and disposed of. These lines had a deficit for each of the formula years, and admittedly would have had a deficit under any formula. It is conceded that the BCR&N allocation of new securities must be a judgment allocation; but it is claimed that the Commission ignored factors, other than earnings, which indicate value of the BCR&N property. Some of these factors whose omission is complained of have already been dealt with and dismissed as irrelevant. But it is claimed that these omitted factors are relevant in determining joint divisions of freight rates in the event of actual severance of BCR&N properties from the system. The Commission found that ap-

proximately 85 per cent of the BCR&N Line's traffic is interline. By reason of its intersection by many important trunk lines, it is claimed that the BCR&N, as an independently operated railroad, would be in a position to exact maximum divisions from such trunk lines with resulting favorable effect upon the BCR&N earnings. Evidence was given showing actual divisions received prior to 1902 while the BCR&N was still an independent line. The Commission considered that by reason of the dissimilarity of conditions in 1902 and now, present results would be wholly speculative, both as to what the divisions would be and the extent to which the BCR&N could control the routing of its interline traffic; also, separate operation would mean increased expenses, such as overhead. The court believes that these criticisms of the evidence are valid. It was subsequently to 1902 that the Commission was given power to fix maximum rates and to prescribe just and reasonable divisions of joint rates, and the shipper given the right to choose between alternative through routes.

■ The court is of opinion that the relative net ton miles of the different mortgage divisions are not an indication of relative values because they take no account of the character of the traffic or of the income derived therefrom.

■ Finally, it is contended that the 1936-1937 formula results must be disregarded in allocating securities to the BCR&N bonds because agricultural conditions in BCR&N territory were greatly depressed. The Commission's report states that the BCR&N territory suffered a relatively greater agricultural depression than did other Rock Island territory in 1936 and 1937, and this condition should be considered in allocating securities to the BCR&N, although the proper allowance therefor cannot be determined precisely by any mathematical formula. The actual weight assigned to this factor by the Commission does not appear in the report, but that does not justify the court in holding that the Commission failed to take this factor into account.

■ It is true that the Commission does not find that the system would be benefited if the BCR&N property could be abandoned. The fact that the plan proposes to retain the BCR&N lines in the reorganized system is sufficient evidence of the Commission's conclusion to the contrary. But this conclusion does not bear one way or another upon the adequacy or inadequacy of the allotment of new securities to these bonds. It cannot be denied that the BCR&N is an asset to the system, or claimed that the lines should be abandoned; it may be readily inferred that otherwise the Commission would not have made any allotment of securities. The Commission refused to accept the branch line studies as proof of the existence of definite severance values; the reasons given therefor impress the court as adequate, and indeed the BCR&N Committee does not contend that the branch line studies constitute a useable basis for determining the amount of cash which should be allocated to the BCR&N on an inter-mortgage accounting. But it is claimed that the basic facts contained in those studies with respect to the possibility of alternative routes in the event of severance of the BCR&N, and the extent to which the severed BCR&N could control and give traffic to competing routes, are facts which show the substantial value of the BCR&N to the System, and that these facts should be reflected in the allocation of new securities. Again, it is stated that the information contained in these studies shows the important function of the BCR&N as a traffic producer for the system and is exceedingly pertinent for the purpose of any genuine effort to arrive at the importance of the BCR&N to the balance of the system; it is claimed that, notwithstanding, these facts were accorded "no discernible weight in the Commission's report." The claims of elements of value thus made are merely general statements; to say that the Commission gave them no discernible weight is unwarranted unless that statement is intended to mean no more than that the Commission's allocations cannot be weighed or measured by any mathematical process. As noted, the Committee has no quarrel with a judgment allocation (Brief, p. 8); but a judgment result cannot be tested by what is discernible therein.

■ Neither does the net salvage value of the BCR&N property have any bearing upon the amount of new securities to which the bonds are entitled. The property is not to be turned into scrap and could not be unless and until the Commission approved its abandonment; no application for abandonment has been made and the question whether public convenience and necessity permit the same is not involved in this proceeding. The railroad is im-

pressed with a public duty; the bond-holders acquired their bonds with knowl-edge of the company's obligations in that respect.

The claims for "strategic importance" of the BCR&N property are not impres-sive; what has been said concerning simi-lar claims on behalf of the St. Paul & Kansas City Short Line is applicable here.

### Convertible Bonds.

The $32,228,000 principal amount of these bonds are wholly unsecured obliga-tions of the principal debtor. They are without expectancy of lien on any of the debtor's property; the debtor's covenant in the indenture of May 1, 1930, under which these bonds were issued, to make appropri-ate provision for the security of the bonds in any new mortgage, has become impossi-ble of performance.

The Commission found that the value of the free assets (consisting of unmortgaged lines of road, securities and miscellaneous real estate and equipment) aggregates $16,591,250.82 and that such free assets do not justify the issuance of other than common stock against them. Of the total no-par common stock provided for in the plan, $151,242,434 stated at $100 per share, the Commission allocated $16,256,036 there-of in respect of the free assets and allotted the same between unsecured creditors (in-cluding the Convertible Bondholders) and the holders of certain mortgage bonds in partial satisfaction of their deficiencies, all at the rate of 4⅓ shares of stock for each $1,000 of claims. Thus, $13,965,467 is al-lotted to the Convertible Bondholders.

The objections of the Convertible Bond-holders to the plan are (1) allocation of all of the senior securities to secured creditors while allocating only common stock to the unsecured creditors, (2) under-valuation of the free assets by approximately $9,000,000, and (3) discrimination in favor of BCR&N Bondholders resulting from the allocation to them of a portion of the common stock issued against the free assets.

 Counsel claim that the non-al-location of any senior securities to the un-secured creditors in respect of the free as-sets is due to what they term the Com-mission's "no lien" theory. The court does not pause to inquire whether the Commission entertained any such theory, or, if so, that it had the effect asserted. The court agrees that there is no need for any lien in order that the unsecured credi-

tors should obtain their full rights in re-spect of the free assets. The unsecured creditors are entitled to share fully and ratably therein; they have the right to resort to and realize upon the free assets without preference of one over another. The question is, What form shall that realization take? The Commission con-cluded that it should take the form of com-mon stock because the nature of the free assets is such that the issuance against them of interest-bearing securities or pre-ferred stock is unjustified. It is that con-clusion which must be tested.

 Counsel have shown industry and ingenuity in presenting what they con-ceive to be an allotment of new securities required for fair and equitable treatment to the Convertible Bonds. But after giv-ing full and careful consideration thereto, the court is unable to accept the results. Of the value of the free assets as found by the Commission, approximately two-thirds represents depreciated value of equipment of which all is at least 10 years old and more than half is from 15 to 20 years old, with a corresponding limited service life remaining. The Commission considered that in view of the maturity dates of the proposed new bonds, 1991 and 2016, re-spectively, there is no justification in al-locating bonds for this unmortgaged as-set. The court concurs in this view. The Commission found that the remaining $6,300,000 of free assets have no proven earning value. This conclusion is implicit-ly recognized by claimant in that it uses other-than-earnings bases (i.e., block al-lotment or physical valuation) in comput-ing amounts of new securities against numerous items which comprise these free assets. Many such items represent proper-ties not used in railway operations; they produce little or no income and if bonds were issued against them, the interest thereon would have to be derived from other sources. In many cases the values placed thereon by the Commission repre-sent investment cost or depreciated repro-duction cost and not market values; hence, whether the properties could be sold for an amount sufficient to pay the principal of the bonds at maturity is speculative. The nature of other items is such as to give fair assurance that they would not pro-duce sufficient income to service the bonds nor permit any realization to pay the prin-cipal thereof. Such, for example, are, generally speaking the debtor's invest-ments in affiliated terminal companies and

similar joint facilities. It is a fact of common knowledge in the railroad world that a carrier's investments in such corporations are generally non-income producing; the financial structure of such incorporated facilities and the operating contracts between them and their owner lines are customarily arranged so that there is no surplus income and hence no dividends or other return to the owners on their investment, even where the corporate facility has no funded debt. Stock ownership therein is valueless apart from use by the proprietary lines. An analysis of the debtor's claims against certain subsidiary companies, whether evidenced by certificates of indebtedness or mere advances carried on the books of account, shows their illusory character as security for funded debt. The debtor's equity in the Chicago, Rock Island & Gulf properties and the character of the unmortgaged assets of the Improvement Company are too far removed from possibility of cash realization to warrant expectation that the debtor's claims could ever be paid. The court considers it improper to give to the unsecured creditors anything other than an evidence of ownership in the reorganized company in respect of these free assets.

Of the lines of railroad which are part of the free assets, the Liberal-Hitchland line had average earnings (as adjusted) for the formula years of $11,773. The earnings of the Bravo-Santa Rosa line are not separately shown by the formula; this line is subject to a mortgage under which $3,600,000 principal amount of bonds are outstanding. Claimant estimates that the estimated earnings of this line for the formula years exceeded the interest on said bonds by $127,531. It is contended that computed on the same basis which the Commission uses in allocating First Mortgage Bonds and General Mortgage Income Bonds, the Liberal-Hitchland line earnings require an allotment to the unsecured creditors, in lieu of common stock, of $32,855 of First Mortgage Bonds and $156,655 of General Mortgage Income Bonds. With respect to the unmortgaged equity in the Bravo-Santa Rosa Line, the claimed allotment is $1,423,067 of General Mortgage Bonds. This figure was derived by taking reproduction cost less depreciation plus value of lands and rights as of December 31, 1935, amounting to $5,023,067 and deducting therefrom the $3,600,000 of bonds constituting a lien thereon. The value of the equity found by the Commission was $343,067; the difference is due to the fact that the Commission likewise deducted from the $5,023,067 the accrued and unpaid interest on the said bonds to December 31, 1937. The court deems it unnecessary to decide whether either of these values is correct. For the reasons stated with respect to the other free assets mentioned above, the court concludes that the unmortgaged equity in this line does not warrant recognition in the form of interest-bearing debt.

The Indenture Trustee asserts that the Commission's schedules attached to its supplemental report of April 6, 1942 demonstrate that earnings of the Liberal-Hitchland line are used in the plan to support the issuance of senior securities, all of which are allocated to the secured creditors. The court is unable to verify this. The total 1936-1937 adjusted income of the divisions which had earnings, as distinct from deficits, aggregate $5,483,596. The average adjusted income for those divisions which participate in the allocation of new First Mortgage Bonds aggregate $4,311,162; this aggregate is not comprised of any part of the $11,773 of Liberal-Hitchland line earnings. Income Bond allocations were determined in a similar manner, except that estimated earnings of a prospective normal year were used instead of the earnings for the 1936-1937 years. During such prospective normal year, the Liberal-Hitchland line is estimated to have $23,937 income. But here, again, this amount does not enter into the aggregate income of the earnings divisions which participate in the distribution of the General Mortgage Income Bonds, or into the percentages which determine the allocations. The fact that the new mortgages will cover all of the assets of the new company does not support the contention that there will be a diversion of presently free assets for the benefit of the secured creditors; or, stated otherwise, that the plan in effect treats the unsecured creditors as if all of the free assets were now mortgaged to secure the claims of secured creditors. The plan does not reveal such an intimate relationship between system earnings and the total amount of the new interest-bearing obligations to justify the conclusion that the elimination of the earning power and value of unmortgaged assets would necessarily result in a substantially lower capitalization than that fixed in the plan.

The Indenture Trustee contends that senior securities should be issued on account of the $1,153,871 of cash derived from the liquidation of unmortgaged assets since the institution of the reorganization proceedings. In including this entire sum in the total value of the free assets, the court believes that the Commission was very liberal. The disposition of this cash by the Trustees is not shown, i.e., whether used for capital expenditures or for ordinary expenses of the trust estate, and what part, if any, remains unexpended. Hence, it is impossible to know whether and to what extent the reorganized company will benefit. To measure the rights of the Convertible Bondholders by the full amount realized is the practical equivalent of holding that they had a lien on the money. The court is of opinion that the money was available for use by the Trustees for any proper purpose in the administration and operation of the trust estate without accountability to the unsecured creditors. The case is different from the oil royalties which represent a conversion of mortgaged property into cash; being mortgaged, the royalties must be taken into account in measuring the rights of the CO&G Bondholders, and being derived from non-railroad operations and hence not reflected in formula earnings, it is proper that such value be recognized as provided in the plan.

With respect to the additional values claimed for the unmortgaged assets: For the Bravo-Santa Rosa line the claim is $1,080,000; this represents the accrued and unpaid interest on the mortgage bonds outstanding on this line. The unpaid interest is a debt, is secured by the mortgage equally with the principal, and is properly taken into account in determining the value of the equity. The debtor's claims against the Chicago, Rock Island & Gulf and the Rock Island Improvement Company were considered of no value by the Commission. The value of these claims must be measured by their cash realization possibilities. The fact that the CRI&Gulf may have "equities" in various of its lines does not evidence its ability to pay its debts to the parent company. Claimant estimates the value of these equities by using investment cost or depreciated cost of reproduction of the properties. So far as the book investment accounts are concerned, they undoubtedly reflect cash transactions at the time they were made;

but this is far from saying that the cash investments could now be reclaimed, or that these equities (some of which are preceded by more than one mortgage) have a sales value. In many instances, the earnings, if any, available for application to these unsecured debts of the CRI&Gulf are not shown. The court is likewise unimpressed that the claim of the principal debtor against the Rock Island Improvement Company has any actual value. While the Improvement Company has certain unmortgaged property, it likewise has a large mortgage debt of which $4,447,473 is pledged with Reconstruction Finance Corporation; the Commission's analysis of the mortgaged property securing this debt is found in 242 I. C. C. at pages 375–377, from which it is apparent that upon any foreclosure of these Improvement Company mortgages there would inevitably be a large deficiency which would, of course, be entitled to share with the Company's other general creditors in the unmortgaged assets. Under the circumstances, the court believes that the Commission is justified in assigning no value to the principal debtor's claim against the Improvement Company.

The Commission found that the debtor's unmortgaged equipment had a depreciated value of $10,291,251 as of December 31, 1936. It is claimed that this value should be $13,586,779. The difference represents the accrued depreciation between June 7, 1933, the date these proceedings were instituted, and December 31, 1936. The Commission used the same date in obtaining the value of all of the unmortgaged equipment; its apportionment of this equipment to the various creditor interests is shown in its report of October 31, 1940, 242 I. C. C. at page 428. If the value as of June 7, 1933 is to be used for ascertaining one creditor interest, it must be used for all. The report states: "To make the data useable in connection with the formula years as a basis for the plan herein approved, the equipment values should be further depreciated to December 31, 1936."

To revert to June 7, 1933 values would not disturb the relative apportionment.

The alleged error in the allocation of the BCR&N bondholders of $1,024,833 of new common stock out of the total shares to be issued in respect of the free assets, is based upon the fact that the BCR&N bonds are not obligations of the debtor. This allot-

ment to the BCR&N bondholders does not purport to be on account of any personal obligation of the debtor on said bonds. It is perhaps not correct to speak of a "deficiency" as respects these bonds; regardless of designation, the $1,024,833 of common stock is simply a part of the total of the new securities which represent the value in reorganization of the BCR&N bonds. The Commission made a block allotment of common stock to the BCR&N on account of the balance of its claims not provided for in senior securities; it might have added the $1,024,893 in question to its block allotment and have thereby achieved the same ultimate result.

### Choctaw & Memphis First Mortgage Bonds.

The plan provides that $3,524,000 principal amount of these bonds will have their maturity date extended 20 years to January 1, 1969, with preservation of lien, but with annual interest rate reduced from 5 to 4 per cent; with these alterations, they will be assumed by the reorganized company. For accrued and unpaid interest to January 1, 1942, the effective date of the plan, amounting to $1,409,600, the holders of these bonds are allotted $1,409,600 of the new First-Mortgage 4% bonds. No other securities are allotted, but the plan further provides that in the event the court determines that these bondholders should be paid interest on each of the installments of said accrued and unpaid interest, the same shall be paid in cash.

■■■ Choctaw, Oklahoma & Gulf Consolidated Mortgage bonds, junior to Choctaw & Memphis bonds, receive something of value under the plan for their claim upon the assets subject to the Choctaw & Memphis Mortgage. The legality of this feature depends upon whether the Choctaw & Memphis bondholders have received full compensatory treatment. Their seniority rights are fully preserved; the new First-Mortgage bonds given in an amount equal to the accrued and unpaid interest represent, in the opinion of the court, full compensation therefor, taking into account the investment features of these new bonds, such as that the initial issue is comparatively small in amount, that they will constitute a first lien upon the entire system and have the benefit of a sinking fund.

■■■ Whether the reduction in annual interest rate from 5 to 4 per cent over the extended period requires compensatory treatment and, if so, the manner and extent thereof, are questions which must be initially passed upon by the Commission.

### Reorganization Managers.

The plan of reorganization, as modified, provides that there shall be five reorganization managers, who shall carry out the plan under the supervision and control of the court. The power of appointment is in the creditors by groups, each group consisting of one or more specified classes of creditors, and each group having the power to appoint one manager. If any of such groups are unable to agree or fail to make the appointment within a reasonable time, then the court shall appoint the reorganization manager for that group.

The powers conferred by the plan upon the reorganization managers are numerous; some of them relate to subjects which are not only important but upon which the managers are permitted to exercise their judgment. Such, for example, are the power to decide upon the form and provisions of the charter and by-laws of the reorganized company, the number and term of office of directors, whether the common stock shall have cumulative power in the election of directors, the form and provisions of the new mortgages, and to select the individuals who shall constitute the first board of directors. The managers may act through a majority of their number.

■■■ The nature and extent of these powers are such as to make evident that the future welfare of the reorganized company will depend in no small measure upon the decisions and actions of these managers. Therefore, they should be persons not only of ability and experience but also be free from any special allegiance to any single class or group of creditors, in order that the best interests as a whole of the reorganized company may be served. As said by the Supreme Court in Ecker v. Western Pacific R. R. Corp., 318 U.S. 448, 63 S.Ct. 692, 705, 87 L.Ed. ——, "These reorganizations require something more than contests between adversary interests to produce plans which are fair and in the public interest." This is true not only for the production of plans but also for the proper carrying out of a plan after its approval.

■■■ The court is of opinion that, in order to insure fair and equitable treatment of all of the creditors, the appoint-

ment of the reorganization managers should be subject to ratification by the court. The provision that the managers shall carry out the plan "under the supervision and control of the court" does not lessen the necessity or desirability of ratification by the court, but rather the contrary; adequate supervision and control are more likely to be effective where the power of ratification and the power of supervision are united.

### Reconstruction Finance Corporation.

 Certain objectors assert that the plan gives too liberal treatment to the R. F. C. Criticism is particularly directed to the $2,500,000 new 10-year note, to be secured by collateral representing various miscellaneous interests in the Rock Island system, principally Rock Island Omaha Terminal, Rock Island Memphis Terminal and Rock Island Improvement Company bonds. The average 1936-1937 adjusted income of these properties was approximately 4% of the total of such average for the system, whereas, the amount of the new note is approximately 10% of the total new fixed-interest debt. The Commission properly rejected cost of reproduction less depreciation of the Omaha Terminal and the Memphis Terminal properties as the basis for allotment of new securities against the pledged bonds of those companies. Because of the nature of the collateral and of the properties represented thereby, it is difficult to ascribe thereto a proper value for the purpose of fixing the amount of the new note. Upon the facts of record, the court believes that while $2,500,000 is liberal, and that some lesser amount would not be open to valid objection, the question is one about which informed judgments might reasonably differ, and the court will not substitute its judgment for that of the Commission.

### Miscellaneous.

 There are two matters which the court believes deserve further consideration by the Commission, namely: (1) The plan provides for the issuance of $11,-000,000 First Mortgage Bonds which may be sold or pledged to provide new money. The greatly increased cash on hand since the plan was certified will make unnecessary the sale or pledge of said bonds. Their distribution to such classes of creditors and in such proportions as the Commission's judgment shall approve, should be considered. (2) The effective date of the plan is January 1, 1942. In view of the time which must elapse before the plan can be put in effect, the effective date of the reorganization might well be left to be fixed by the Reorganization Committee in the light of the time when the reorganization securities will be available for delivery, but not earlier than January 1, 1943, nor later than January 1, 1944.

### Conclusion.

The court has considered the objections to the plan and finds them without merit with two exceptions. These are

(a) The claim of discrimination arising from the distribution of new common stock to the First & Refunding bondholders because of their second lien on the General Mortgage properties. The Commission should determine what, if any, portion, of the 335,844.2 shares of new common stock allotted to the First & Refunding bonds should be allotted to the General Mortgage bonds, in addition to the securities allotted to them under the plan, in order to afford full compensatory treatment to the General Mortgage bonds; and

(b) The provisions of the plan relative to the appointment of reorganization managers. For the reasons heretofore given, the court concludes that said provisions of the plan are not fair and equitable.

But for the two exceptions noted, the court is satisfied and concludes that the provisions of the plan comply with subsection b of Section 77 of the Bankruptcy Act, that the plan is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders; that the approximate amounts to be paid by the debtor, or by any corporation or corporations acquiring the assets of the several debtors herein, for expenses and fees incident to the reorganization, have been fully disclosed so far as they could be ascertained at the date of the hearing, are reasonable, are within such maximum limits as are fixed by the Commission and are, within such maximum limits, subject to the approval of the court, which approval has been given by order entered in these proceedings on April 15, 1942 and amendment of April 27, 1942; that the plan provides for the payment of all costs of administration and all other

allowances made or to be made by the court; and that all of the statutory prerequisites to the approval of the plan as certified to the court by the Interstate Commerce Commission have been met.

For the reasons heretofore given the plan is not approved; and the court, on motion of any party in interest, will enter an order referring the proceeding back to the Commission for further action.