BADENHAUSEN et al. v. GUARANTY TRUST CO. OF NEW YORK et al.

GUARANTY TRUST CO. OF NEW YORK et al. v. SEABOARD AIR LINE RY. CO. et al.

No. 5249.

Circuit Court of Appeals, Fourth Circuit.

Aug. 2, 1944.

Abraham Mitnovetz, of New York City, and James H. Price, of Greenville, S. C. (Harry O. Levin, of Baltimore, Md., James D. Poag, of Greenville, S. C., and Llewellyn S. Richardson, of Norfolk, Va., on the brief), for appellants.

W. H. B. Simpson, pro se.

Edwin S. S. Sunderland, Leonard D. Adkins, and Irwin L. Tappen, all of New York City (Thomas O'G. FitzGibbon, of New York City, Leon T. Seawell, of Norfolk, Va., Carlyle Barton, George R. Coleburn, and Thomas J. Grogan, Jr., all of New York City, Theodore S. Garnett, of Norfolk, Va., Edward E. Watts, Jr., of New York City, Robert D. Ruffin, of Norfolk, Va., Bernard Meredith, of Richmond, Va., Eben J. D. Cross, of Baltimore, Md., Humes, Buck, Smith & Stowell, of New York City, and Baird, White & Lanning and George M. Lanning, all of Norfolk, Va., on the brief), for appellees.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This appeal is taken from a decree of the District Court in an equity proceeding, whereby a plan for the reorganization of the Seaboard Air Line Railway Company, prepared by a special master, was approved after it had been modified in certain particulars in accordance with proposals of a Conference Committee of representative secured creditors appointed by the court.

The Railway Company has been in receivership for more than thirteen years.[1] On December 23, 1930 receivers were appointed in the District Court of the United States for the Eastern District of Virginia in an equity suit brought by an unsecured creditor; and on the same day the same receivers were appointed in ancillary proceedings in the District Court of the South-

ern District of Florida. During this period bills for foreclosure have been filed in the cause by the trustees under various mortgages secured by Seaboard property and all of these proceedings have been consolidated in the cause pending in the Virginia District.

Several efforts have been made to effect a plan of reorganization. In 1935 at the instance of the court the receivers made studies and proposals looking toward a reorganization, but the earnings of the Railway were so poor that the principal secured creditors opposed the formulation of a plan at that time. On October 27, 1939 the court appointed Tazewell Taylor of Norfolk, Virginia, special master to prepare and submit a plan of reorganization. He conducted extended hearings during forty days at various times in 1940, 1941 and 1942, took evidence, received statistical studies, plans submitted by parties in interest, and finally on July 20, 1943, after a prolonged study of the complex factual material, submitted his report. Proposed plans were filed with the special master by the Consolidated Committee, representing the holders of the First and Consolidated Mortgage, one of the general mortgages of the system, and by the Underlying Committee representing the bonds under ten separate underlying mortgages on the Seaboard system. The Consolidated Committee employed Miles C. Kennedy, an expert engineer or statistician, and the Underlying Committee employed William Wyer, likewise an expert in railroad accounting and reorganization. Both experts testified as witnesses in the case. Hearings in the District Court upon exceptions to the master's report took place at three sessions, aggregating thirteen days in October, November and December, 1943. In the interval between the second and third sessions a Conference Committee appointed by the court considered the testimony that had been offered, conferred with interested parties and recommended modifications of the master's plan, which the court approved.

### The Seaboard's Secured Debt.

The extent of the railway system and the many kinds of indebtedness including se-

[1] The receivership was conducted by Judge Luther B. Way of the Eastern District of Virginia almost from its beginning until his death in October, 1943. The case was then transferred to Judge W. Calvin Chesnut of the District of Maryland, who, in company with Judge Alexander Akerman of the Southern District of Florida, conducted the final hearings upon the adoption of the plan and filed an exhaustive opinion approving it, after modification, in Guaranty Trust Co. v. Seaboard Air Line Ry. Co., D. C., 53 F.Supp. 672.

curities issued under numerous mortgages covering all or a part of the property have greatly increased the difficulties of reorganization. The Seaboard owns about 3300 miles of railroad and operates an additional 844 miles under leases or operating agreements with subsidiary corporations in Virginia, North Carolina, South Carolina, Georgia, Alabama and Florida. Two thousand miles are subject to ten separate underlying divisional mortgages on which $48,549,767.20 in principal and interest was owing on January 1, 1943. There are also four general mortgages aggregating 160,439,473.33 in principal and interest on that date, which are subject to the underlying divisional mortgages but constitute first liens on certain portions of the system. There are 36,806,862.55 of collateral trust obligations. There is in addition the debt of subsidiary railroad and terminal companies which amounts, principal and interest, to the sum of 55,059,209.16; and additional indebtedness and unpaid accrued interest not included in the above amounting to 983,290.03. There were also outstanding on January 1, 1943 38,412,882.37 in obligations of the receivers consisting of receivers' equipment trust certificates, receivers' certificates and other indebtedness. Thus the grand total of the principal and interest of the secured debt was $340,251,484.64

During the receivership the receivers have purchased approximately $34,000,000 of outstanding receivers' certificates and other secured obligations of the system, most of which were acquired under orders of the court without prejudice to the claims of the parties as to the application of the funds. The receivers have also spent more than $50,000,000 in improvements to the system.

The unsecured claims, principal and interest, amount to $1,193,723.97 as of August 1, 1942. The par value of the outstanding capital stock, preferred and common, aggregates $85,110,662.21.

The insolvency of the Railway Company is not disputed and the plan makes no provision for the participation in the new company of the preferred or common stockholders or the unsecured creditors of the old company. No objection to the plan on this account is raised on this appeal.

### The New Capitalization.

The special master's plan of reorganization proposes that all of the properties owned by the Seaboard, all the wholly owned or partly owned subsidiaries, and all the leased lines shall be included in one railroad system. The plan involves two fundamental features: (1) A reduced capitalization for the new company composed of various kinds of securities; and (2) the allocation of these securities among the many classes of secured creditors of the present company. The proposed new capitalization is based upon the earnings, history and prospects of the Railway, as found by the special master. The operating revenues during the fifteen year period ending in 1940 were greatest in the year 1926 when $71,274,835 with a total gross income of $14,640,842 was received. The lowest receipts occurred in 1932 when these figures were $30,791,618 and $720,031 respectively. In 1940 they were $48,596,779 and $4,761,958 respectively. The average annual gross income for the ten year period 1931–1940 was $2,936,004 and for the five year period 1936–1940 $3,718,053. A marked increase occurred in the succeeding three years as is shown by the following tabulation.

| | Gross Operating Revenues | Gross Income |
|---|---|---|
| 1941 ........... | $ 64,729,178 | $10,664,016 |
| 1942 ........... | 110,467,787 | 34,566,102 |
| 1943 (estimated) | 137,000,000 | 28,000,000 |

It is of course recognized that this great increase is due to war activities which will not continue and that upon the recurrence of normal times a very great shrinkage is inevitable. With these facts in view the capitalization finally proposed by the special master as of January 1, 1944 is as follows:

| Title of Issue | To Be Assumed or Issued on Reorganization | Annual Charges, Interest and Dividends |
|---|---|---|
| Rentals and misc. charges, undisturbed.................... | | $ 110,000 |
| Undistributed Receivers' Equipment Trusts.............. | $ 11,870,000 | 336,000 |
| First Mortgage Forty Year 4% Bonds, Series A (distribution) ..................................... | 32,500,000 | 1,300,000 |
| Total fixed interest debt .......................... | $ 44,370,000 | |
| Total annual fixed charges .................... | | $1,746,000 |
| Capital Fund (discretionary, not in excess of 3¼% of Total Railway Operating Revenues or $1,625,000, whichever is greater ................................... | | 1,625,000 |
| Sinking Fund for First Mortgage Bonds Series A (1%).. | | 325,000 |
| Total Annual Charges prior to interest on Income Mortgage Bonds ....................................... | | 3,696,000 |
| Income Mortgage 50-Year 4½% Bonds, Series A......... | 52,500,000 | 2,362,500 |
| Sinking Fund for Income Mortgage Bonds, Series A ($262,500) ..................................... | | |
| Total fixed and contingent debt...................... | $ 96,870,000 | |
| Total annual charges before dividends.............. | | $6,058,500 |
| Preferred stock 5% ($100 par value).................... | 15,000,000 | 750,000 |
| Total par value of securities....................... | $111,870,000 | |
| Total annual charges against income through preferred stock dividends............................. | | $6,808,500 |
| Common Stock—850,000 shares of no par value (at $100).. | 85,000,000 | |
| Total capitalization ........................... | $196,870,000 | |

Under this set-up, the total of the interest on the first mortgage bonds and fixed annual charges prior to interest on the income bonds and dividends will be $3,696,-000. The interest on the income bonds if earned will be $2,362,500, making a total annual charge before dividends of $6,058,-500 on a principal indebtedness fixed and contingent of $96,870,000. If the net earnings exceed $7,000,000, a contingency not unlikely during the present emergency, it will be possible not only to pay a dividend on the 5% preferred stock but also some dividend on the no par capital stock.

The District Judge recognized that the proposed new capitalization must receive the approval of the Interstate Commerce Commission under 49 U.S.C.A. § 20a, before it can become effective; but finding it to be reasonably conservative and to have received the approval of all the interested parties except certain stockholders and certain unsecured creditors, he overruled all exceptions thereto. No appeal from this ruling has been taken.

### Allocation of New Securities.

The allocation of the new securities to the secured creditors of the insolvent corporation presents a more difficult problem. In general the modified plan provides for the distribution of new securities and cash among eight underlying bond issues, three general mortgage issues, two collateral trust issues and four leased line issues, that is, seventeen issues in all. During the course of the receivership two of the underlying mortgage issues, one of the general mortgage issues and one of the leased line mortgage issues, have been excluded from participation in the distribution and certain receivers' certificates and other obligations have been paid off so that the total claims, principal and interest as of January 1, 1944, to which securities or cash are allocated under the plan, were reduced to the sum of $284,511,000, not including $11,870,000 of equipment obligations to be assumed by the new company. It is obvious that the new capitalization of $196,-870,000, including the $11,870,000 of equip-

ment obligations, even if worth its face value, is insufficient to pay the secured creditors in full. It is not reasonable, however, to suppose that the new securities will be worth par; and it has been assumed by the master and this court, for comparative purposes, in fixing the relative values of the new securities, that the first mortgage bonds will be worth par, the income mortgage bonds $500, the preferred stock $25 a share and the common stock $12.50 a share.

A principal difficulty consists in the apportionment of the securities among the holders of first liens on separate divisions of a railroad system which includes wholly owned mileage, leased lines and independently operated mileage. An apportionment is necessary because the value of the first lien in any case depends upon the value of the property upon which it is based; and the difficulty is especially acute in the case of certain divisions which during the test period made no net earnings but only deficits in operation when considered independently.

### The Secondary Allocation.

The complexity of the calculation is increased by the fact that the master first made a primary allocation on the assumption that the total issue of first mortgage bonds would be $40,000,000 and that of the income mortgage bonds $45,000,000; and then made a more conservative allocation on the assumption, which was finally adopted, that the total issue of first mortgage bonds should be reduced to $32,500,000 and the total issue of income mortgage bonds should be increased to $52,500,000. A secondary allocation was also necessary because after the first proposed capitalization had been generally accepted, it became clear that due to the heavy increase in the revenues of the system a substantial part of the funds in the hands of the receivers could be used in the retirement or acquisition of certain outstanding obligations; and in consequence the court directed the receivers to acquire certain receivers' certificates in the hands of the public so that the principal amount thereof outstanding as of March 1, 1943 was reduced to the sum of $12,841,600. There were also purchases of two issues of underlying first mortgage bonds, bonds of one of the leased lines and the acquisition of certain collateral pledged for loans. The purchased securities were not canceled but held for the benefit of the remaining Seaboard security holders. These circumstances necessitated the reallocation of securities previously allotted to the holders of the purchased securities.

### Principles of the Plan.

The amount of new securities allotted to any division was made to depend upon the relative value of the divisional property considered as a separate entity; and this value was determined principally by the earnings of the division calculated by a method which gives rise to an important controversial question that will be discussed hereafter. After the value of the division is ascertained in relation to the value of the whole system an equal proportionate amount of the new securities at their estimated market value is allocated thereto to be distributed: (1) To the holders of the first lien thereon to the extent of the principal and interest of their claims; and (2) the excess is awarded to the holders of the second and subsidiary lines in their respective order. In this way the principle of priority to which first liens are entitled was observed; and no objection on this point is made.

While the master gave predominant weight to the respective earning capacities of the several divisions, he did not disregard other criteria. He took into consideration the net value to the system of the freight contributions made by each of the divisions; and also the reproduction cost new thereof less depreciation. He also gave heed to certain "severance studies" whose purpose was to estimate the effect upon a division of the system and upon the system as a whole that would flow from the severance of the division from the system. These studies, however, were not made upon the Georgia and Alabama line and the South Bound line because the evidence showed that these lines would be without substantial value in case of severance from the system.

By adopting these principles of capitalization and allocation the master acted in accord with the decision of the Supreme Court in Group of Investors v. Chicago, Milwaukee, St. P. & P. R. Co., 318 U.S. 523, 540, 63 S.Ct. 727, 738, 87 L.Ed. 959, where it is said:

"* * * A basic requirement of any reorganization is the determination of a capitalization which makes it possible not only to respect the priorities of the various classes of claimants but also to give the

new company a reasonable prospect for survival. See Commissioner Eastman dissenting, Chicago, M. & St. P. Reorganization, 131 I.C.C. 673, 705. Only 'Meticulous regard for earning capacity' (Consolidated Rock Products Co. v. DuBois, supra, 312 U.S. 510, 525, 61 S.Ct. 675, 685, 85 L.Ed. 982) can afford the old security holders protection against a dilution of their priorities and can give the new company some safeguards against the scourge of overcapitalization. Disregard of that method of valuation can only bring, as stated by Judge Evans for the court below, 'a harvest of barren regrets.' 124 F.2d [754], page 765. Certainly there is no constitutional reason why earning power may not be utilized as the criterion for determining value for reorganization purposes. And it is our view that Congress when it passed § 77 [11 U.S.C.A. § 205] made earning power the primary criterion. The limited extent to which § 77, sub. e, provides that reproduction cost, original cost, and actual investment may be considered indicates that (apart from doubts concerning constitutional power to disregard them) such other valuations were not deemed relevant under § 77 any more than under § 77B, 11 U.S.C.A. § 207, 'except as they may indirectly bear on earning capacity.' Consolidated Rock Products Co. v. DuBois, supra, 312 U.S. page 526, 61 S.Ct. [675], 85 L.Ed. 982. In this case the Commission followed the statute. While it made earning power the primary criterion, it did not disregard the other valuations. It considered them and concluded in substance that they afforded no reasonable basis for believing that the probable earning power of the road was greater than what the Commission had found it to be by the use of other standards. The Commission need not do more."

 While earnings do not furnish an exclusive test, they are recognized as a most important criterion in determining the values of the several divisions of a railroad system when it becomes necessary to apportion amongst them the new securities of a reorganized company. See the Milwaukee case, 318 U.S. 523, 540, 559, 63 S.Ct. 727, 87 L.Ed. 959; New York, N. H. & H. R. Co. Reorganization, 239 I.C.C. 337, 406, 407. It was therefore necessary to segregate the earnings of the mortgage divisions of the Seaboard system in accordance with some reasonable method. There is no fixed or inflexible rule for such a calculation when, as in this case, a railroad system has been operated as a whole and there has been no need to segregate the earnings of the several parts.[2] The difficulties inherent in such a situation are aptly described in the Milwaukee case, 318 U.S. 523, 561 to 564, 63 S.Ct. 727, 747, 87 L.Ed. 959, where it is said:

"The problem in such a case is not a simple one. The contribution which each division makes to a system is not a mere matter of arithmetical computation. It involves an appraisal of many factors and the exercise of an informed judgment. Furthermore, an attempt to put precise dollar values on separate divisions of one operating unit would be quite illusory. As the Commission recently stated, 'The properties comprise one operating unit; a complete separation of values would necessarily have to be based on extensive assumptions of unprovable validity; and any attempt at such a separation would in the end serve no purpose except to present an apparent certainty in the formulation of the plan which does not exist in fact.' St. Louis Southwestern Ry. Co. Reorganization, 252 I.C.C. 325, 361. In the present case the Commission and the District Court were satisfied that they had adequate data based on earning power to make a fair allocation of new securities between the General Mortgage bonds and the 50-year bonds. We cannot say that it was inadequate. Sec. 77 contains no formula for the making of such an allocation nor for the determination of the earning power of the entire system or parts thereof. The earnings periods to be chosen, the methods to be employed in allocating system earnings to the various divisions are matters for the informed judgment of the Commission and the Court. * * * We are not dealing here merely with a first mortgage and a

---

[2] § 77, sub. e, of the Bankruptcy Act, 11 U.S.C.A. § 205, sub. e, provides: "The value of any property used in railroad operation shall be determined on a basis which shall give due consideration to the earning power of the property, past, present, and prospective, and all other relevant facts. In determining such value only such effect shall be given to the present cost of reproduction new and less depreciation and original cost of the property, and the actual investment therein, as may be required under the law of the land, in the light of its earning power and all other relevant facts."

second mortgage on a single piece of property. For each of the two groups of bondholders has a first lien on a part of the Milwaukee properties. In case of first and second liens on the same property, senior lienors of course would be entitled to receive in case the junior lienors participated in the plan, not only 'a face amount of inferior securities equal to the face amount of their claims' but in addition, 'compensation for the senior rights' which they surrendered. Consolidated Rock Products Co. v. DuBois, supra, 312 U.S. 510, 529, 61 S. Ct. 675, 686, 85 L.Ed. 982. But where, as here, each group of bondholders is contributing to a new system mortgage separate properties from old divisional mortgages, it is necessary to fit each into the hierarchy of the new capital structure in such a way that each will retain in relation to the other the same position it formerly had in respect of assets and of earnings at various levels. If that is done, each has obtained new securities which are the equitable equivalent of its previous rights and the full priority rule of the Boyd case [Northern Pacific R. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931], as applied to the rights of creditors inte se, is satisfied. * * * No fixed rule supplies the method for bringing two divisional mortgages into a new capital structure so that each will retain in relation to the other the same position it formerly had in respect of assets and of earnings at various levels. The question in each case is one for the informed discretion of the Commission and the District Court. We cannot say that that discretion has been abused here."

The master took the five year period, 1936 to 1940, for the test and he adopted, with certain modifications, what has come to be known in this case from the name of its author as the Kennedy Segregation Formula. It was devised by Miles C. Kennedy, the expert employed to assist the Consolidated Committee.[3] He suggested certain important modifications of a general formula which had been prepared by the receivers. The basic principle of the general formula is that freight revenues on traffic local to one line should be allocated thereto; but where the freight revenues are applicable to two or more lines, they are allocated thereto on a pro rata basis subject to an allowance of 10 per cent of the revenues from each shipment to the line originating, terminating or interchanging it. Passenger revenue local to one line is allocated thereto; and passenger revenue applicable to two or more lines is divided pro rata on a mileage basis. Operating expenses and other income debits and credits are allocated to the lines by which they are incurred. Routine expenses, such as wages and fuel, are apportioned pro rata on a mileage basis. A rental charge for system equipment at the rate of $3\frac{1}{2}$ per cent of its average annual depreciated book value is allocated to the several divisions.

The Kennedy modifications of the general formula consist principally in adding a "constructive mileage block" to the actual mileage on the originating, terminating and interchanging lines and dividing the revenue of each shipment among the particular lines in proportion to the total mileages of the respective lines thus obtained. The mileage block was ascertained by finding the system cost of originating and terminating a car of freight or interchanging it with another road. The cost of originating and terminating a car of freight was found to be equal to the cost of hauling it a distance of 58 miles and the cost of interchanging a car was found to be equal to hauling it a distance of 16 miles.

Under the Kennedy formula the revenue from the passenger traffic was apportioned on the basis of actual mileage that each passenger was hauled. The master departed from this method in the treatment of passenger losses which he apportioned to all of the lines of the system in the relation that the gross freight revenue of each line bore to the total freight revenue of the entire system. He calculated for each line the percentage which its loss from passenger operations bore to the total loss from passenger operations of the whole system and also the percentage which the revenue from freight operations on each line bore to the total revenues from freight operations on the entire system. If the percentage of the revenue from freight operations was less than the percentage of loss from passenger operations on any line, it was given credit for this difference to compensate it for the excess loss from passenger operations; and, on the other hand, if the percentage of freight revenues was relatively

---

[3] The Underlying Committee's expert, William Wyer, also proposed a formula on the "segregation" basis without regard to the interest of any particular underlying issue of bonds.

higher on the individual line it was charged with the difference in order to make its fair contribution to the total loss sustained from passenger operations.

The Kennedy formula of segregated earnings was not the only basis used in the allotment of securities to the several lines. In the primary allocation the first mortgage bonds, other than those allotted on account of receivers' indebtedness, investment securities and cash on deposit with the trustees, were allotted solely on the basis of earnings with certain adjustments; but the income mortgage bonds, other than those allotted on account of investment securities and a special allotment to the South Bound to be later discussed, were allocated one-half thereof on the basis of segregated earnings and one-half on the basis of the net value of freight contributions. Both preferred and common stocks, other than the allotment thereof on account of investment securities, were allocated one-third on the basis of segregated earnings, one-third on the basis of net contributions of freight traffic and one-third on the basis of the value of the property determined by the estimated cost of reproduction new less depreciation.

It therefore appears that in making the allocation of new securities the special master recognized that the value of the particular line rests not only in the earnings it produces as a separate unit, but also in the contribution that it makes by originating, terminating and interchanging freight moving over the system as distinguished from local freight traffic. Effect was given to this contribution in the allocation of new securities by calculating the net freight contributions of the several lines and giving to each its proportionate share of the securities allocated on this basis. The amount of the net contributions was ascertained by determining the gross earnings which the system derived from traffic originating or terminating on the various mortgage divisions, including traffic interchanged by a mortgage division with a foreign line and determining the net value to the system of those contributions after deducting out-of-pocket expenses. Twice the weight was given to each dollar of freight contributions resulting from termination or origination as is given to contributions resulting from interchange.

The master also recognized the element of value based on reproduction cost new less depreciation. This was ascertained in the case of each division from valuations furnished by the Interstate Commerce Commission; and each division was given its proportionate share of that portion of preferred and common stocks allocated on this basis as above set out.

The secondary allocation was based solely on segregated earnings. It consisted of first mortgage bonds which had been allotted in the primary allocation to certain receivers' certificates and bond issues subsequently acquired by the receivers. Since the deficit lines received no segregated earnings under the Kennedy formula, they did not share in the secondary allocation.

The allocation of first mortgage bonds to earning lines exclusively finds support in the fact that the total annual fixed charges under the new capitalization are substantially the same as the average earnings of the Seaboard system during the test period 1936 to 1940. The master estimated that the total annual charges (including interest on the first mortgage) of the reorganized company prior to interest on the income mortgage bonds will be $3,696,000. The average gross income for the Seaboard system during the test period was $3,718,053, an amount sufficient to pay only the annual charges and interest of the senior securities of the reorganized line.

There was no year after 1930 and before the war in which the earnings of the Seaboard system were sufficiently high to have permitted the payment of the full amount of the interest on the new income mortgage bonds. Consequently the junior securities of the new system could not be allocated entirely on the basis of segregated earnings and the master, as we have seen, also took into consideration other methods in allocating these securities.

### Tertiary Allocation.

The allocations of the special master were the subject of critical examination in the extended hearings in the District Court and in the conferences between the several classes of secured creditors with the result that additional modifications of the plan were made by a reallocation of securities derived from several sources. Funds in the receivers' hands were used to purchase receivers' certificates to which first mortgage bonds had been allotted in the prior allocation; first mortgage bonds and junior securities allotted to certain underlying mortgage divisions were released, when their claims were otherwise satisfied; prior

allocations as between underlying and general mortgages on the same division were rearranged in certain instances; and other securities were shifted as the result of a more equitable accounting with respect to deficits. The total securities in cash released by these changes approximated $15,000,000.

The allocation of this amount gave recognition to an argument strongly urged upon the court and the Conference Committee and finally accepted, that since the deficit lines had become earning lines during the war years 1942 and 1943, they should share in the distribution of the accumulated funds in the receivers' hands. It was therefore decided to make the tertiary allocation in accordance with a method suggested by Mr. Wyer, the expert of the underlying mortgage lines. First it was ascertained what amount would have been necessary to pay interest and dividends, including a dividend of $3.50 per share on the common stock, on the total amount of securities allocated by the special master, as if his plan had gone into effect on January 1, 1942. The percentage of this total to which each line would have been entitled upon the securities allocated to it was then ascertained, and the line was then given the same percentage of the securities available for the tertiary allocation. The result was that all the deficit lines shared in the allocation, and the allocations to the appellant deficit lines were materially increased.

This final allocation, arrived at by the modification of the special master's report recommended by the Conference Committee and approved by the court, embodies the labor of many persons for many months. It represents an adjustment of complex and conflicting claims that cannot be worked out in precise figures without certain assumptions that must be based on business adjustment rather than upon mathematical certainty; and it has received the approval of the experts employed by opposing interests as a fair and business like solution that will do substantial justice and effectuate the reorganization without further undue delay.

### The Appellants' Contentions.

A preliminary procedural question fundamental to the case is raised by the appellants. It is said that upon the enactment of § 77 of the Bankruptcy Act in 1933, 11 U.S.C.A. § 205 which provided for railroad reorganizations in bankruptcy, the Seaboard equity proceeding should have been dismissed and the reorganization of the railroad should have been conducted by the bankruptcy court. The purpose of § 77 to vest important functions in railroad reorganization in the Interstate Commerce Commission in cooperation with the bankruptcy court, as expounded in Ecker v. Western Pacific R. Corp., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892, is stressed; and special reliance is placed on the decision in New England Coal & Coke Co. v. Rutland Ry. Co., 2 Cir., 143 F.2d 179. In the latter case the District Court had before it an equity receivership begun in 1938 after the enactment of § 77, and it denied a petition of the Railroad Company for reorganization under the bankruptcy statute. The Court of appeals reversed. It said that before the enactment of § 77 railroad reorganization in equity was approved because the Bankruptcy Act was not applicable to railroad corporations and reorganization in equity was necessary in the public interest; but after the enactment the reason vanished and equity reorganization is now merely a means for the frustration of the public policy of the United States embodied in the statute. A petition for rehearing was filed, calling attention to the action of Judge Chesnut in approving the reorganization of the Seaboard in equity for the reasons expressed in his opinion in the pending case at 53 F.Supp. 697, 700. The petition for rehearing also referred to subsection p of § 77 which expressly recognizes equity reorganization by making it unlawful for any person in a receivership in a state or federal court to solicit proxies from creditors without the prior approval of the Interstate Commerce Commission; and to § 506 of the Revenue Act of 1942, 56 Stat. 798, 26 U.S.C.A. Int.Rev.Acts and § 1808 (e) of the Internal Revenue Code, 26 U.S. C.A. Int.Rev.Code, § 1808(e) which exempted from stamp taxes any securities issued in the reorganization of a railroad in an equity proceeding.

In overruling the petition for rehearing, the court pointed out that the Seaboard receivership had been begun in 1930, when railroad reorganizations in bankruptcy were impossible, so that there was no irregularity in the institution of the suit; and that the pendency of proceedings of this sort gave full scope to the cited statutory provisions which recognize equity receivership. Therefore, the court reiterated its holding that the passage of § 77

makes it improper for an equity court to entertain a suit for railroad reorganization and such a proceeding should be dismissed if the irregularity is called to the attention of the court by the filing of a petition under § 77 or otherwise.

We have no occasion to go so far in the pending case. Neither the insolvent corporation nor creditors holding five per cent of the indebtedness of the corporation have filed a petition in bankruptcy, as provided in § 77, sub. a. When the question of bankruptcy was broached before the special master, the interested parties expressed a desire to continue in equity and when the court of its own motion invited a discussion on the point all the parties in interest very definitely preferred continuation of the equity proceeding. See 53 F.Supp. 698. The reasons for this attitude on the part of the creditors are obvious. If the present proceeding were dismissed and the parties were relegated to the bankruptcy court, the whole matter of the plan would necessarily be reopened, further rehearings would have to be held, and a protracted delay of months, if not years, would probably occur. In the meantime, the golden opportunity would have been lost. In view of the long and careful investigation and study by the special master and the District Judge, and the constant examination and criticism of every step of the procedure by the interested parties, it is obvious that the public interest will be sufficiently protected in the present case by the requirement that the approval of the Interstate Commerce Commission to the new capitalization be obtained. Under these circumstances there was clearly no error when the District Judge failed to dismiss the proceeding of his own motion and permitted the creditors who alone are interested in the distribution of the securities to consummate the plan of reorganization during the present period of prosperity.

### Georgia and Alabama Appellants.

Among the numerous classes of interested parties, which include the holders of bonds issued under seventeen separate mortgages, unsecured creditors and stockholders, there are two appellants. One of these is the Protective Committee for the Georgia and Alabama Railway First Consolidated Mortgage 5% bonds due 1945. This committee has filed an affidavit in this court stating that it represents $671,000 bonds out of a total of $6,085,000 bonds outstanding. The bonds are secured by an underlying divisional mortgage on a part of the system. The Underlying Committee represents bondholders under all of the ten underlying divisional mortgages and this committee has assented to the plan. Its representatives stated at the hearing in the District Court that 61% of the Georgia and Alabama bonds had been deposited with it and that it still represented more than 50% of these bonds, after deducting the bonds held by the Georgia and Alabama appellants. Many of the arguments urged in this court by these appellants were presented to the District Court by the Underlying Committee. The Georgia and Alabama appellants made no appearance before the special master and appeared in the case for the first time at the hearings before the District Court in October, 1943. They presented no new evidence at these hearings.

The Georgia and Alabama bonds are a first lien on 393.55 miles of railroad extending westerly from Savannah, Georgia, to Montgomery, Alabama. The mortgage also covers equipment subsequently acquired for use on the railroad. The principal of the outstanding bonds amounts to $6,085,000 and accrued interest to $3,803,125, a total indebtedness of $9,888,125.

No first mortgage bonds were originally allocated to the Georgia and Alabama line by the special master since it was a deficit line in the test period. Junior securities allotted with the estimated values were as follows:

| | Par Value | Estimated Value |
|---|---|---|
| Income bonds | $1,583,644 | $ 791,822.00 |
| Preferred stock | 653,199 | 163,299.75 |
| Common stock | 3,711,261 | 463,907.75 |
| | $5,948,104 | $1,419,029.50 |

These amounts were determined on the basis of the freight contributions and the reproduction cost new less depreciation of the line as follows:

| | Freight Contributions | Reproduction Cost | Total |
|---|---|---|---|
| Income bonds | $1,583,644 | $ ....... | $1,583,644 |
| Preferred stock | 370,164 | 283,035 | 653,199 |
| Common stock | 2,108,222 | 1,603,039 | 3,711,261 |
| | $4,062,030 | $1,886,074 | $5,948,104 |

The line received no part of the secondary allocation made necessary by the acquisition of receivers' certificates by the receivers because this allocation was based on segregated earnings for the test period.

The line, however, did share in the tertiary allocation and as the result its total allocation at estimated values is as follows:

| | Par Value | Estimated Value |
|---|---|---|
| First Mortgage bonds | $ 357,408 | $ 357,408.00 |
| Income Mortgage bonds | 1,597,627 | 798,863.50 |
| Preferred stock | 656,461 | 164,115.25 |
| Common stock | 3,739,875 | 467,484.37 |
| | $6,351,371 | $1,787,871.12 |

It thus appears that as the result of the tertiary allocation the securities originally allocated in the Master's plan were increased by the following amounts:

| | Par Value | Estimated Value |
|---|---|---|
| First Mortgage bonds | $357,408 | $357,408.00 |
| Income Mortgage bonds | 13,983 | 6,996.50 |
| Preferred stock | 3,262 | 815.50 |
| Common stock | 28,614 | 3,578.00 |
| | $403,267 | $368,798.00 [4] |

■ The attack of the Georgia and Alabama appellants upon this allocation is directed chiefly at the use of the Kennedy segregation formula to arrive at the relative values of component parts of the system for reasons which may be summarized as follows: The formula, they say, is basicly wrong in that it proceeds upon the false assumption that each mortgage line operates as a separate railroad whereas it actually operates as part of a single system. The problem is to ascertain the relative value of each of the mortgage divisions (bearing in mind that all of the underlying mortgages are liens of the first rank) to the end that in the allocation of the new securities each mortgage division shall receive the equitable equivalent of that which it now possesses. Earning power is the primary test of value and must be used to determine the capitalization of the reorganized corporation. It does not follow, however, that earning power must be used to ascertain the relative values of separate parts of the system, for as pointed out in the Milwaukee case, 318 U.S. 561, 563, 63 S.Ct. 727, 87 L.Ed. 959, quoted above, the contribution which each division makes to a system is not susceptible of arithmetical computation since it involves the appraisal of many factors in the exercise of an informed judgment. These factors include a test period to be chosen and the methods to be employed in allocating system earnings to the various divisions. It was therefore erroneous for the master to allot the new securities on the basis of a mathematical formula especially as it involved certain arbitrary assumptions with respect to the cost of originating, terminating and exchanging business.

■ What should be done is to determine the earnings of the whole system and then ascertain the relative earning power of each division in relation to all other divisions in the system. Not only the individual earnings of the single system, but also the contribution which it makes to the system as a whole, should be considered, and the sum total of these factors will represent the earning power of the division. Had this been done the value of the net freight contributions of the Georgia and Alabama to the system would have been recognized.

They say that a more equitable formula of segregation is the net ton mile formula for which the District Judge and one of the receivers, Henry W. Anderson, a railroad lawyer of large experience, expressed a preference. Under this formula freight revenues are distributed among all the mortgage divisions on the basis of net ton miles of freight traffic moving over the particular division; and passenger revenue is divided on the basis of net passenger miles moving over each division. System expenses are pro rated among the divisions in proportion to the revenues determined in the manner indicated. If the system as a whole shows a profit no division, no matter how small its traffic or how expensive its operation, can show a deficit.

■ More specifically, these Georgia and Alabama appellants complain that the selection of the five year period 1936–40 as the test period was unfair to the Georgia and Alabama line whose earnings during this interval were especially low. Moreover, it was wrong to use the same low level period of earnings for the allocation of the junior as well as the senior securities because the former are only productive

---

[4] The District Judge stated in his opinion: "The very reasonable estimate is that the new first mortgage bonds will have a market value of a little less than par; the income mortgage bonds 50, the preferred stock 25 or 30, and the common stock about 10 or 15 per share. Of course these are only estimates as it is impossible to predict with even approximate certainty future market conditions."

of income to the holder in times of prosperity. It was especially inequitable to use the Kennedy formula in the secondary allocation which consisted in the distribution of first mortgage bonds and junior securities primarily allocated to the holders of receivers' certificates and certain bond issues. These certificates and bond issues were purchased with funds of the system earnings during the boom years 1942 and 1943 when all of the lines showed a profit. Hence the released securities should not have been divided under a formula based on a low earning period but should have been distributed on the basis of the actual earnings of the divisions in the current years.

Finally it is pointed out that the allocation of securities approved by the court gave to the Georgia and Alabama line the poorest treatment of all the underlying divisions; and the inadequacy of the allocation is seen by comparing the estimated value of the securities allocated to the line with its salvage value of $1,200,000 and its reproduction cost of $7,886,829.

These contentions of the Georgia and Alabama appellants relate primarily to questions of fact which have been resolved against the appellants by the special master and the District Judge after long and laborious consideration. With respect to the modified plan as a whole and the allowance to the Georgia and Alabama line in particular the judge said, 53 F.Supp. 692, 695:

"After very full consideration of the many complex problems involved in the proposed reorganization, the court is of the opinion that the master's plan of reorganization, with the modifications proposed by the Conference Committee, 'is fair and equitable, and affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the laws of the land with respect to participation of various classes of creditors and stockholders' and that except as so modified the master's plan of reorganization should be confirmed.

\* \* \* \* \* \*

"While this increased allocation to the line is still unsatisfactory to a substantial portion of the bondholders represented at the hearing, the evidence in the case affecting the Line does not justify a larger allowance to it of the limited amount of the new capitalization in fair and equitable treatment of all secured creditors."

The judge took the position that the master's findings should be accepted unless clearly erroneous. He pointed out that the intricate problems of allocation involved in the plan are to a large extent business problems that are not controlled by definite rules of law but must be solved by the exercise of an informed judgment after careful consideration; that the conflicts which had arisen between competing interests had been adjusted by agreement of large portions of the affected classes, in which agreement large numbers of bondholders of the classes to which the appellants belong have joined; and that the adjustment was fair and equitable and should be given effect during the golden opportunity presented by the present prosperous condition of the Seaboard system.

This approach to the case is obviously correct since rule 53(e) (2) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, expressly provides that in an action tried without a jury the court shall accept findings of fact of a master unless clearly erroneous. Especially imperative is the rule when, as here, the master has lived with the case for four years, has patiently studied the complex questions involved and has listened with painstaking care in extended hearings to the arguments and proposals of all the parties who desired to be heard. Moreover, at the present juncture of the case we have before us the exhaustive opinion of the District Judge after additional testimony had been taken, additional argument heard, and the parties had had an opportunity to present their views to a Conference Committee representing divers classes of conflicting claims. It becomes our duty on review to affirm the determination of the court so made unless there is a clear showing that the limits of informed judicial discretion have been exceeded. Milwauke case, 318 U.S. 523, 551, 563, 63 S.Ct. 727, 87 L.Ed. 959.

The duty of the appellate court in reviewing the determinations of a special master and a court of equity or bankruptcy with respect to a plan of railroad reorganization could hardly be better stated than was done in Kansas City Terminal Ry. Co. v. Central Union Trust Co., 8 Cir., 28 F.2d 177, 184, where it was said:

"At the threshold of such a test in this case, we are met by a preliminary contention respecting the burden of proof as to such 'fairness.' Wherever that burden may lie in the trial court, there is no doubt concerning it in this court. It is firmly established that when a matter is committed to the sound discretion of a chancellor, his determination thereon will not be set aside unless clearly shown to be erroneous. The wisdom of this rule is accentuated where the matter involved is the reorganization of an insolvent property in receivership under the chancellor approving or disapproving the plan of reorganization. The administration of an insolvent operating property during receivership is so largely a practical business matter that the chancellor gains an experience and insight into the property, its condition, its needs and the relative attitude of interested parties which can never, in its entirety, be transmitted to the printed record. From this intimate association with the property must necessarily come no inconsiderable portion of the 'informed discretion concerning the practical adjustment' of the chancellor."

There was no abuse of discretion by the court in the pending case. On the contrary there is abundant evidence to support the specific finding of the court that a larger allowance to the Georgia and Alabama could not be justified. Indeed William Wyer, the railroad expert employed to represent all the underlying lines and to be impartial in his determination of their relative claims, testified that the Georgia and Alabama is the weakest part of the system to which the underlying liens attach, that the Seaboard would not lose any material amount of business if the Georgia and Alabama were separated from the system, and, that the Georgia and Alabama could not be successfully operated as an independent railroad.

The tests to which these conclusions were subjected have met the approval of experienced authority. The method used by the master to ascertain the relative values of the mortgage divisions was not novel or unfair. Some means of segregating the earnings of the several divisions which had previously been operated as a single system were needed when the time came to apportion to each mortgage division its fair relative share of the new capitalization. The Kennedy formula is not unlike the method used by the Interstate Commerce Commission to segregate the earnings of divisional lines on a mileage basis, including a constructive mileage block for originating, terminating or interchanging traffic, in reorganization cases. See, New York, N. H. & H. R. Co. Reorganization, 224 I.C.C. 723; New York, Susquehanna & Western Railroad Co. Reorganization, 236 I.C.C. 425; Central of Georgia Railway Reorganization, 252 I.C.C. 587.

Four formulas to determine the relative values of the several mortgage divisions were proposed in this case. Under three of them, the general formula, the Kennedy formula and the Wyer formula, neither the Georgia and Alabama nor the South Bound Railroad Company showed any segregated earnings during the test period. Under the fourth formula, the net ton mile formula, some small percentage of the system earnings would perhaps have been shown although the appellants present no definite figures for the test period to support this conclusion. Moreover, this formula has not been actually used in any railroad reorganization and has been disapproved in principle in New York, N. H. & H. R. Co. Reorganization, 224 I.C.C. 723, and In re Chicago, Rock Island & Pacific R. Co., D.C., N.D.Ill., 50 F.Supp. 835. The formula is open to certain definite criticism and objections. It proceeds upon the assumption, contrary to the actual fact, that each ton mile earns as much as every other ton mile, and that every part of the system must contribute something thereto and must therefore share in the system profit. It fails to recognize that some lines can be more economically operated than others because of their more favorable location, more efficient construction, or because of the kind and volume of the traffic which they handle. Judge Chesnut expressed some preference for the formula, perhaps because of its simplicity, but he was unable to find that the master's choice of the Kennedy formula was clearly wrong and he felt that it was impracticable to adopt the net ton mile formula in this case when none of the parties save one had advocated it and its use at this time would necessitate a complete revision of the statistical data required for the allocation of the new securities and a long delay which should be avoided. We find no error in this connection.

Likewise we find no error in the selection of the five years 1936–1940 as the

test period. The decision was important since the segregated earnings of this period furnished in large measure the basis for determining the relative values of the mortgage divisions. A period of five years rather than a shorter period was chosen as more likely to represent the changing conditions of the future. The years 1926 to 1930 and the war years were excluded because of their abnormal prosperity, and the years 1931 to 1935 were excluded for the opposite reason. It was the opinion of Mr. Kennedy, the expert, that the years 1936 to 1940 fairly represent what the situation of the Seaboard will be after its reorganization, and the Judge accepted this conclusion as correct.

The distribution of junior securities is attacked by the Georgia and Alabama appellants because it is based in part upon the Kennedy segregation formula for the period 1936 to 1940, when the earnings were at such a level that only the interest on the new first mortgage bonds could have been paid. As we have seen, the income bonds were allocated one-half on the basis of segregated earnings and one-half on the basis of freight contributions while the preferred and common stocks were allocated one-third on the basis of segregated earnings, one-third on the basis of freight contributions and one-third on the basis of the physical value of the property. It is contended that this was unfair because junior securities bear income only in good times and should therefore be allocated on the basis of a prosperous year such as 1942 when the segregated earnings of the Georgia and Alabama line under the Kennedy formula would have been $1,017,000 out of a total system earnings of $34,566,-000. On this theory the Georgia and Alabama would have been entitled to about 3% of the junior securities on the basis of segregated earnings. The line actually received over 3% of the income bonds and over 4% of the preferred and common stocks in the final allocation. This happened because the distribution of junior securities was not made exclusively on the basis of segregated earnings but partly on the basis of freight contributions and physical value. If it is the appellants' theory that all of the junior securities should have been allotted on the basis of segregated earnings for the year 1942, it appears that the Georgia and Alabama fared better in the new distribution that was actually made. If, on the other hand, it is the theory of the appellants that the allocation of junior securities should be made partly on the basis of segregated earnings and partly on the basis of freight contribution and physical value, the appellants fail to point out what weight should be given to each of these factors and what the final result would have been. In short, the burden to show error in the plan in respect to the allocation of junior securities has not been met.

Finally, the secondary and tertiary allocations are made the subject of attack, the former because it made no allowance to the Georgia and Alabama line and the latter because the allowance was too small. In both cases it is stressed that funds accumulated during the receivership were spent to cancel indebtedness whereby new securities previously allocated were released for reallocation; and it is said that the new reallocation should not have been made on the basis of the segregated formula used in the primary allocation but on the basis of the earnings of the prosperous years 1942 and 1943 to which the Georgia and Alabama line contributed. So far as the secondary allocation is concerned it is sufficient to say that our attention has not been directed to any evidence to show that the new securities of an estimated value in excess of $13,000,000, which entered into that allocation, were derived from earnings for the year 1942 rather than the earnings of previous years; nor is there any showing as to what charge should be made against the Georgia and Alabama earnings of the prosperous years because of the monies spent upon the line for deficiencies or betterments during the receivership. It is stated in the court's opinion, 53 F.Supp. 691, that the net earnings for the system for 1939 were $3,965,-858; in 1940 $4,761,958 and in 1941 $10,-664,016. During 1939 the deficit of the Georgia and Alabama was $213,305 and in 1940 $125,051; but there is no showing as to the segregated earnings or losses of the Georgia and Alabama for the year 1941. The opinion also shows that upwards of fifty million dollars was spent by the receivers on the system for needed repairs and improvements, but the amount spent on the several divisions is not stated.

The substantial increase in the securities allocated to the Georgia and Alabama as the result of the tertiary allocation was the direct result of the recommendation of the Conference Committee that the earnings of

all the lines in 1942-3 be recognized, and there is no showing that the share thereof allocated to the Georgia and Alabama line was insufficient.

Contentions of the South Bound Appellant.

The South Bound Railroad Company owns 136.13 miles of railroad extending from Columbia, South Carolina, to the environs of Savannah, Georgia. It forms part of the main north and south line of the Seaboard system for passenger traffic between Florida and the North. It was originally used for through freight traffic, but thirty years ago the Seaboard acquired the Eastern Carolina lines, lying closer to the Atlantic seaboard, and ever since they have been used exclusively for through freight because they lie in more level territory, while the South Bound, except for local freight, has been operated as a passenger line. The passenger lines of the Seaboard, as in the case of most railroads, have been operated at a substantial loss.

The South Bound is a deficit line. During the test period 1936 to 1940 the aggregate deficit was $1,997,403 and the average annual deficit was $399,480.60. In 1942 the gross income after adjustments calculated under the Kennedy formula was $896,761.

The line is subject to an underlying first mortgage to secure the payment of $2,-033,000 of 5% bonds which matured April 1, 1941. In addition the unpaid accrued interest to January 1, 1944 is $1,772,521.88 so that the total secured debt in the hands of the public as of January 1, 1944 was $3,805,521.88. The appellant is the holder of a small minority of these bonds, the exact number not being stated. The Underlying Committee, according to statements made at the hearing in the District Court represents 67% of the bonds and, as above stated, has approved the plan.

The allocation of the new capitalization to the holders of the South Bound bonds was made, as in the case of the holders of the Georgia and Alabama bonds, partly on the basis of segregated earnings under the Kennedy formula and partly on the basis of freight contributions and the physical value of the road. The allocation under the special master's plan was increased by the tertiary allocation approved by the court. In addition the special master awarded to the South Bound a block allotment of $750,-000 of income bonds in recognition of the status of the property as an essential link of the Seaboard system for passenger traffic. The total allocation under the plan finally adopted and the increase in the allocation under that plan over the allocation in the master's plan are shown by the following tables:

1. Total Allocation under Plan as Adopted.

| | Par | Estimated Value |
|---|---|---|
| First Mortgage bonds | $ 162,801 | $162,801. |
| Income Mortgage bonds | 977,348 | 488,674. |
| Preferred stock | 225,234 | 56,308.50 |
| Common stock | 1,281,920 | 160,215. |
| Total | $2,647,303 | $867,998.50 |

2. Total Allocation per $1,000 under Plan as Adopted.

| | Par | Estimated Value |
|---|---|---|
| First Mortgage bonds | $ 80.08 | $ 80.08 |
| Income Mortgage bonds | 480.74 | 240.37 |
| Preferred Stock | 110.79 | 22.45 |
| Common Stock | 630.56 | 78.82 |
| Total | $ 1,302.17 | $ 421.72 |

3. Total Increase under Plan as Adopted over Master's Plan.

| | Par | Estimated Value |
|---|---|---|
| First Mortgage bonds | $ 162,801 | $162,801 |
| Income Mortgage bonds | 6,370 | 3,185 |
| Preferred Stock | 1,486 | 371.50 |
| Common Stock | 13,034 | 1,629.25 |
| Total | $ 183,691 | $167,986.75 |

4. Total increase per $1,000 under Plan as Adopted over Master's Plan.

| | Par | Estimated Value |
|---|---|---|
| First Mortgage bonds | $ 80.08 | $ 80.08 |
| Income Mortgage bonds | 3.13 | 1.57 |
| Preferred Stock | .73 | .18 |
| Common Stock | 6.41 | .80 |
| Total | $ 90.35 | $ 82.63 |

This appellant adopts the applicable arguments of the Georgia and Alabama appellant which, for the reasons above stated, cannot be sustained. In addition this appellant stresses the fact that the South Bound bondholders have been given junior securities in place of first lien securities which they now hold; and that the face value of the new securities allotted to the South Bound Division is less than the amount of the mortgage indebtedness. It is sufficient, however, in allotting securities to a mortgage division in a railroad reorganization if compensation is awarded on a fair and equitable basis having regard for the relative value of the divisional property determined in large part by its

earnings; and if this is done, it is not required that each class of creditors shall receive securities of equal rank with their former holdings. See, Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 530, 61 S.Ct. 675, 85 L.Ed. 982; the Milwaukee case, 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959; Missouri Pacific Railroad Reorganization, 240 I.C.C. 15. The appellant offers no proof that the South Bound was not fairly and equitably treated in this respect.

The appellant also contends that certain property subject to the lien of the South Bound mortgage was not taken into account in valuing the property of the line and in determining the allocation to which it was entitled. It is said that a portion of the line running from Central Junction, a point north of the center of the City of Savannah, into the freight depot and yards in the heart of the city was erroneously omitted in the master's calculations and that the value of this part of the line was one million dollars. There was put in evidence a deed of May 14, 1890 from the City of Savannah to the South Bound Railroad Company which purports to cover land underlying this portion of the Seaboard system on condition that the construction of the road to the city be finished in two years from March, 1890; but so far as we are able to determine, there is no evidence that the portion of the line constructed thereon became the property of the South Bound Railroad Company or was made subject to its mortgage. It seems that the railroad facilities now on the property were constructed by the Florida Central and Peninsular Railroad as lessee and have always been treated as subject to the mortgage of that road. Moreover, there is no evidence, as far as we can find, to sustain the contention that this portion of the line has a value of one million dollars, or that the allocation of the South Bound would have been materially increased if the property had been treated as subject to the lien of its mortgage. The appellant has failed to make proof of the facts upon which the contention is based.

The South Bound appellant also makes the contention that the South Bound bondholders were unfairly treated because no allowance was made to them in respect to a covenant in a lease of the railroad and equipment executed in 1892 by the South Bound Railroad to the Florida, Central and Peninsular Railroad, which was subsequently merged into the Seaboard system. The equipment covered by the lease is said to have been worth one million dollars; and the lessee agreed to replace it with new equipment, when it was worn out by use. It is said that the special master should have made an inquiry to locate the old equipment and ascertain its value, apparently for the purpose of determining whether the covenant had been kept. Such an inquiry, however, would have been futile, for even if a breach of the covenant chargeable to the Seaboard had been disclosed, nothing would have been added to the value of the bondholders' security. The obligation in the lease was not supported by any security or lien, and a breach of the covenant, if in fact one occurred, would have given rise only to an unsecured claim for which the plan of reorganization provides no payment.

Our conclusion is that the appellants have not met the burden, imposed upon them by their appeal, to show that the allocation of securities is inequitable or unfair to them and that the District Judge stepped beyond the bounds of his discretion in giving it his approval. The contentions advanced represent the views of only a relatively few security holders in an intricate corporate system. They have received the careful scrutiny, to which they were entitled, in the several tribunals to which they have been submitted; but they should no longer be permitted to impede a reorganization so long and carefully studied in the District Court and so earnestly pressed by the overwhelming majority of secured creditors who desire to avail themselves of the present period of railroad prosperity.

The judgment of the District Court is

Affirmed.